# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2561 |
| COMPLETE TITLE: | State of Wisconsin, <br>　　　　Plaintiff-Respondent, <br>　　v. <br>David McAlister, Sr., <br>　　　　Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
(no cite)

| | |
|---|---|
| OPINION FILED: | April 17, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 11, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Emily S. Mueller |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | KELLY, J., concurs (opinion filed). |
| DISSENTED: | A.W. BRADLEY, J., dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Robert R. Henak*, *Ellen Henak*, and *Henak Law Office*, *S.C.*, Milwaukee. There was an oral argument by *Robert R. Henak*.

For the plaintiff-respondent, there was a brief filed by *Scott E. Rosenow*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Scott E. Rosenow*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP2561
(L.C. No. 2005CF0324)

STATE OF WISCONSIN          :          IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**David McAlister, Sr.,**

      **Defendant-Appellant-Petitioner**

**FILED**

**APR 17, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the court of appeals. *Affirmed.*

¶1    PATIENCE DRAKE ROGGENSACK, C.J.    In January 2007, a jury convicted David McAlister, Sr. ("McAlister") of attempted armed robbery (threat of force), armed robbery (threat of force) and possession of a firearm by a felon for crimes that occurred in late 2004.  At trial, the State presented testimony from Nathan Jefferson ("Jefferson") and Alphonso Waters ("Waters"). They testified that McAlister was their accomplice in the robberies.

¶2    In 2014, McAlister filed the Wis. Stat. § 974.06 motion for a new trial that is now before us.  He alleged that he had newly discovered evidence represented by the affidavits

of three men who allege that Jefferson and Waters lied when they testified that McAlister was involved in the crimes for which he was convicted. The circuit court[1] denied McAlister's motion without an evidentiary hearing, and the court of appeals affirmed.[2]

¶3 Our review focuses on whether McAlister has provided newly discovered evidence that is sufficient to require the circuit court to hold an evidentiary hearing. In so doing, we consider whether the affidavits McAlister submitted in support of his motion meet the requirements necessary to qualify as newly discovered evidence. We specifically examine whether the affidavits were cumulative evidence and whether they were uncorroborated evidence for which corroboration should be required.

¶4 We conclude that the affidavits were merely cumulative evidence because they were additional evidence of the same general character as was subject to proof at trial, i.e., that Jefferson and Waters lied when they implicated McAlister in order to achieve favorable plea bargains for themselves. We also conclude that the affidavits were insufficient to require the circuit court to hold a hearing on McAlister's motion for a new trial because they were supported by neither newly discovered corroborating evidence or circumstantial guarantees

---

[1] The Honorable Emily S. Mueller of Racine County presided.

[2] State v. McAlister, No. 2014AP2561, unpublished order (Wis. Ct. App. Aug. 10, 2016).

of trustworthiness. Therefore, the circuit court did not erroneously exercise its discretion when it denied McAlister's motion for a new trial without an evidentiary hearing. State v. Avery, 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60. Accordingly, we affirm the court of appeals' affirmance of the circuit court.

## I. BACKGROUND

¶5 The two crimes of which McAlister was convicted occurred in December 2004 in the City of Racine. On December 21, Nathan Jefferson and Monique McAlister ("Monique") attempted an armed robbery of the Catholic Community Credit Union (the "Credit Union").[3] When the Credit Union's security alarms began to ring, Jefferson and Monique ran from the scene without any money. On December 28, Waters, Jefferson and Monique committed an armed robbery at Wisconsin Auto Title Loan ("Title Loan").

¶6 Police arrested Waters and Jefferson separately in March 2005 for robberies unrelated to the December 2004 robberies. Waters was questioned by Racine Police Investigator William Warmington regarding an armed robbery that occurred at an Open Pantry. Waters initially denied any knowledge or involvement, but after being confronted with video footage that Warmington indicated matched the description of one of the offenders, Waters admitted that he had been involved. Waters

---

[3] Monique McAlister is the defendant David McAlister's niece. She also is referred to as Monic McAlister in the record.

told Warmington that McAlister had planned the robbery at Title Loan and served as the getaway driver. Waters described in detail the location of and the interior of McAlister's home, including where the gun used in the Title Loan robbery could be found.

¶7 Upon his arrest, Jefferson told police that McAlister had planned each of the December robberies, served as the getaway driver and provided the gun he carried at the Credit Union. Based on the information obtained from Waters and Jefferson, police obtained a search warrant for McAlister's residence, where they found a .22-caliber handgun. McAlister, who is a convicted felon, was arrested.

¶8 At McAlister's trial, Waters testified on behalf of the State. He testified that shortly before December 28, 2004, McAlister had driven Waters to Title Loan, where he instructed Waters how to conduct the robbery. On December 28, McAlister picked up Waters in a gray Hyundai, a picture of which was received as Exhibit 4 and then picked up Monique and Jefferson.

¶9 After testifying that the gun the police took from McAlister's house, which had been marked as Exhibit 11, was "very familiar," Waters described the robbery itself. On cross-examination, defense counsel repeatedly attacked Waters' credibility. Defense counsel hammered on Waters' history of lying to police, calling attention to Waters' initial statements to police after his March 2005 arrest.

Q. You denied that you robbed the Open Pantry?

4

A. Yes.

Q. You told them: No, I didn't. I had no involvement with that?

A. Yes.

Q. Then they told you that they had video of the robbery?

A. Yes.

Q. And that they believed you were the guy that did it?

A. Right.

. . . .

Q. You knew then that the detectives had solid evidence establishing that you had committed an armed robbery?

A. Yes.

Q. At that point in time, you asked the detectives: What am I looking at?

A. Right.

Q. And by that you meant, how much prison time am I going to get for having done this armed robbery?

A. Yeah.

Q. Then you asked them, quote, what can I tell you to help me, right?

A. If I -- yeah. If I did, instinct I did because I knew that I was in trouble. I didn't know, you know, what was really going on. So you know, yeah, I was looking for help.

. . . .

Q. You are willing to lie to keep yourself out of jail?

5

A. Well, out of instinct because I've -- I've been arrested so many times, 13 times, and when they -- when I seen that I was in trouble, of course, yes. I -- I didn't want to be in trouble. I was trying to talk my way out of it, yes.

. . . .

Q. Now, the whole reason that you started to ask them about what you could do to help yourself and will they give me a break if I tell something, is you wanted to make a deal, right?

A. No. I knew that by being honest -- because I've dealt with the court system for so long, I knew if I was being honest, that things would be easier on me in the long run because the more you lie, the more trouble you get into. So I wanted to clear things up at that time.

. . . .

Q. Now, you are aware that in November . . . November 10th, of 2003, you came into contact with police at that point. It was an Officer Stehlow who had asked you your name, and at that point in time you told him your name was Steve Jordan, correct?

A. I don't remember that.

[Defense counsel refreshes Waters' recollection].

Q. Okay. Now that you've reviewed that, you recall that in November of '03, you were confronted by this police officer?

A. Yes. And I obstructed by telling him a different name, yes.

. . . .

Q. Now, on October 30th, of 1998, do you recall being again confronted by the police and identifying yourself as Steve Morris, with a date of birth 12/6 of '68?

[Defense counsel refreshes Waters' recollection].

6

A.    I obstructed.  I gave a false name.

. . . .

Q.    On July 19th, of 1998, do you recall having been confronted by the police and identifying yourself as Marcus L. Booker, date of birth 12/16 of '69?

A.    Not that I recall.

[Defense counsel refreshes Waters' recollection].

Q.    Okay.  You agree with me that on this day you lied to the police, gave them the name Marcus Booker, date of birth 11/18/69?

A.    Yes.

Q.    And again, the whole reason that you lied was to try to keep yourself out of jail?

A.    Yes.

Q.    That's something that you are willing to do?

A.    At those moments, yes.

Q.    But not at this moment?

A.    Those were the past.  This is the future.

Q.    When did the future begin?

A.    The day that I got arrested.

Q.    So for the first time in your career, first time in your adult life that you decided that things were going to be different and now you're going to tell the truth, was when you were arrested by Investigator Warmington and Investigator Diener?

A.    Yes.

¶10  On re-cross, defense counsel suggested that because Waters now faced 154 years total incarceration, he had a very big incentive to implicate McAlister.  Waters denied that he had any knowledge of a deal.

7

Q. You understand that because you've agreed to testify here today, that what the prosecutor is going to do is he's somehow going to reduce your exposure?

A. No. I didn't know any of that.

Q. You were unaware that your lawyer had cut this deal with the prosecutor?

A. No, no. I never -- no one ever brought me anything about a deal to me, no.

Q. Your lawyer, who is sitting right there, your position is he has never discussed with you the fact that you have an agreement with the DA?

A. No.

¶11 The following day, however, the court read this stipulation to the jury:

The State of Wisconsin by Assistant District Attorney James Newlun and defendant David McAlister personally and by attorney Patrick K. Cafferty hereby agree that the following is true. One, the District Attorney's office has agreed that it would reduce the maximum sentence Alphonso Waters faces by either dismissing some of his charges or reducing the seriousness of the charges.

Two, the District Attorney's office has agreed to recommend that Alphonso Waters should serve less prison time than it would have recommended if Alphonso Waters had not testified in the trial of David McAlister.

And three, Assistant District Attorney James Newlun conveyed the terms of this agreement to Alphonso Waters through his attorney Douglas Pachucki sometime prior to Waters testifying on January 23rd, 2007.

¶12 Jefferson also testified on behalf of the State. During his questioning by the assistant district attorney,

8

Jefferson admitted that he had a plea bargain with the State and the terms of that bargain.

¶13 Jefferson admitted that he and Monique attempted to rob the Credit Union. He said that McAlister had driven them to and from the Credit Union in a four-door gray Hyundai, a picture of which was received as Exhibit 5. He said that McAlister provided the .22 semiautomatic handgun that he carried, which he identified as Exhibit 11.

¶14 Jefferson also testified about the Title Loan armed robbery. Jefferson stated that on that day, in the same vehicle, McAlister drove Jefferson, Waters and Monique to Title Loan to commit the robbery. After the robbery, McAlister drove the four of them back to his apartment, which Jefferson described consistently with Waters' earlier description given to police.

¶15 When questioned by police, Jefferson stated that he had originally lied, but later told the truth about the two robberies. Jefferson testified that at the time of his arrest he was aware that Waters had also been arrested because McAlister had told him as much. McAlister had told Jefferson, "Don't say nothing about the robberies; and if I did, that he'll make my life a living hell."

¶16 On cross-examination, defense counsel stressed that the effect of the plea agreement between Jefferson and the State was that Jefferson's imprisonment exposure was reduced from 60-plus years to 20 years. As he did with Waters, defense counsel

drew attention to Jefferson's past lies to police to avoid going to jail.

¶17 At the conclusion of testimony, the circuit court read the following jury instructions regarding witnesses' testimony:

It is the duty of the jury to scrutinize and to weigh the testimony of witnesses and to determine the effect of the evidence as a whole. You are the sole judges of the credibility, that is the believability, of the witnesses and of the weight to be given to their testimony. In determining the credibility of each witness and the weight you give to the testimony of each witness, consider these factors.

Whether the witness has an interest or lack of interest in the result of this trial; the witness's conduct, appearance and demeanor on the witness stand; the clearness or lack of clearness of the witness's recollections; the opportunity the witness had for observing and for knowing the matters that the witness testified about; the reasonableness of the witness's testimony; the apparent intelligence of the witness; bias or prejudice, if any, that has been shown; possible motives for falsifying testimony; and all other facts and circumstances during the trial which tend either to support or to discredit the testimony.

. . . .

You have heard testimony from Alphonso Waters and Nathan Jefferson who stated that they were involved in the crimes charged against the defendant. You should consider this testimony with caution and great care, giving to it the weight that you believe it is entitled to receive. You should not base a verdict of guilty upon it alone unless after consideration of all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty.

You have heard testimony from the two witnesses Alphonso Waters and Nathan Jefferson who have received consideration for their testimony. These witnesses, like any other witness, may be prosecuted for testifying falsely. You should consider whether receiving consideration affected the testimony and

give the testimony the weight that you believe it is entitled to receive.

¶18 Following deliberations, McAlister was found guilty of attempted armed robbery with use of force in violation of Wis. Stat. § 943.32(2), armed robbery with threat of force in violation of § 943.32(2) and possession of a firearm by a felon in violation of Wis. Stat. § 941.29(2).

¶19 In May 2008, McAlister moved for a new trial, arguing that (1) the State failed to provide full disclosure of the terms of agreements struck between the State and Waters and Jefferson; (2) the jury was not informed that Waters' and Jefferson's plea offers were "performance based" or otherwise contingent on their value to the State; (3) the State failed to correct Waters' alleged perjury; (4) the real controversy was not fully tried because the jury did not hear testimony from alibi and other witnesses; and (5) McAlister had received ineffective assistance of counsel because defense counsel failed to introduce alibi and exculpatory evidence. His motion was denied following an evidentiary hearing on October 23, 2008.

¶20 On May 19, 2014, McAlister filed the motion for postconviction relief under Wis. Stat. § 974.06 that is now before us, claiming that he had newly discovered evidence. In support of his motion, McAlister submitted affidavits of three men who claimed that Jefferson and Waters admitted prior to trial that they intended to falsely accuse McAlister of involvement in crimes in order to reduce their own punishment.

11

¶21 Wendell McPherson ("McPherson") swore that in March 2006, while he and Waters were incarcerated at Dodge Correctional Institution, Waters told McPherson that "he lied and told the police that, David McCallister [sic] planned these armed robberies, [and] also said he lied and told police that David McCallister [sic] gave him the gun to use and [] drove the get away car." Waters also allegedly told McPherson that while he was in Racine County Jail, he wrote Jefferson explaining what to say to police. The attestation of McPherson's affidavit occurred March 22, 2013, seven years after the alleged conversations with Waters took place.

¶22 Corey Prince ("Prince") swore that between January 4, 2006 and May 25, 2007, while he and Jefferson were in the Racine County Jail, Jefferson told him that his co-defendant, Alphonso "Bird" Waters, had instructed him on exactly what to say regarding their pending charges. Jefferson allegedly told Prince that "the older man was never involved in any of the robberies they committed[, and] 'Bird' instructed him to lie so that they could receive a shorter sentence." Prince said that in 2012 he met McAlister at the Waupun Correctional Institution. Prince said he overheard McAlister talking about his case, and how two men named "Nate" and "Bird" had framed him. Prince then approached McAlister and told McAlister what he knew. Prince's affidavit was attested to on August 8, 2012, between five and one-half and six years after the alleged conversation with Jefferson took place.

¶23 Antonio Shannon ("Shannon") swore that on December 28, 2004, he and a woman were sitting in his car across from Title Loan.  They saw a hooded man running towards them, followed by police sirens.  Two years later, Shannon was housed in the Racine County Jail with Jefferson.  Jefferson told Shannon of his involvement in the Title Loan robbery.  Shannon said that Jefferson told him that he and a man named "Bird" were the only two people involved in the robbery, but that he had an "out," which was a plea deal if he testified against "someone he said was not involved in the robbery."  The attestation was signed on September 25, 2013, seven years after the alleged conversation took place.

¶24 McAlister argued, pro se, that he was entitled to a new trial as a matter of due process.  The circuit court denied McAlister's motion without an evidentiary hearing.  The court of appeals affirmed.  We granted review, appointed counsel for McAlister, and now affirm the court of appeals.

## II.  DISCUSSION

### A.  Standard of Review

¶25 The issue in this case is whether McAlister's Wis. Stat. § 974.06 motion for a new trial is sufficient to entitle him to an evidentiary hearing based on a newly discovered evidence claim.  To decide that question, "[f]irst, we determine whether the motion on its face alleges sufficient facts that, if true, would entitle the defendant to relief."  State v. Allen, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.  We review

13

this question of law, independently, based on the specific factual allegations made and the record as a whole. State v. Bentley, 201 Wis. 2d 303, 309-10, 548 N.W.2d 50 (1996).

¶26 Second, "if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief," the decision to grant or deny a hearing is within the circuit court's discretion. Allen, 274 Wis. 2d 568, ¶9. "A circuit court erroneously exercises its discretion when it applies an incorrect legal standard to newly-discovered evidence." State v. Plude, 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42 (citing State v. McCallum, 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997)).

### B. General Principles

#### 1. Perjury concerns

¶27 The gravamen of McAlister's argument is that Waters and Jefferson perjured themselves at his trial when they testified that he was involved in armed robberies. At the outset, we emphasize that "the crime of perjury erodes the integrity of our judicial system." State v. Canon, 2001 WI 11, ¶9, 241 Wis. 2d 164, 622 N.W.2d 270. Its effect is profound whether the perjury is in trial testimony or in affidavits submitted to the court. This is so because "[i]t is fundamental to the American system of jurisprudence that a witness testify truthfully. Without truthful testimony, it is nigh onto impossible to achieve the primary goal of our judicial system,

14

justice." State v. Rivest, 106 Wis. 2d 406, 416-17, 316 N.W.2d 395 (1982); see also United States v. Mandujano, 425 U.S. 564, 576 (1976) ("Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative.").

¶28 However, whether to grant a hearing on a Wis. Stat. § 974.06 motion for a new trial based on newly discovered evidence that claims to uncover perjured trial testimony requires careful examination of the movant's specific factual allegations in the context of the record as a whole. Zillmer v. State, 39 Wis. 2d 607, 612-13, 159 N.W.2d 669 (1968). Furthermore, in a § 974.06 motion, the burden shifts to the defendant who must show the need for a postconviction evidentiary hearing with a clearly articulated justification. State v. Balliette, 2011 WI 79, ¶58, 336 Wis. 2d 358, 805 N.W.2d 334.

### 2. Postconviction motions

¶29 "After the time for appeal or postconviction remedy provided in Wis. Stat. § 974.02 has expired, a prisoner in custody under sentence of a court may bring a motion to vacate, set aside, or correct a sentence, utilizing the procedure set out in Wis. Stat. 974.06." Id., ¶34 (citing State v. Allen, 2010 WI 89, ¶22, 328 Wis. 2d 1, 786 N.W.2d 124). Under § 974.06(1), a prisoner may make such a motion where he or she is claiming that: (1) his sentence was imposed in violation of

15

the constitution; (2) the court imposing the sentence was without jurisdiction; (3) the sentence was in excess of the maximum; or (4) the sentence is otherwise subject to collateral attack. Id.

¶30 McAlister argues that his motion is a matter of due process. The State, however, argues that claims of actual innocence based on newly discovered evidence do not fall into any of the permissible categories under Wis. Stat. § 974.06. The State raises an interesting issue given the facts presented; however, we do not decide this issue because the State did not present it to the circuit court, to the court of appeals or in its response to the petition for review. Accordingly, we deem the issue forfeited. See State v. Hendricks, 2018 WI 15, ¶32, 379 Wis. 2d 549, 906 N.W.2d 666.

### 3. Newly discovered evidence

¶31 If a judgment is to be set aside based on newly discovered evidence, the defendant must provide sufficient evidence to establish that defendant's conviction is a manifest injustice. Plude, 310 Wis. 2d 28, ¶32. To obtain an evidentiary hearing for such an allegation, a defendant must show specific facts that are sufficient by clear and convincing proof, when considered in the context of the record as a whole, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. Avery, 345 Wis. 2d 407, ¶25;

16

State v. Love, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citing State v. Armstrong, 2005 WI 119, ¶161, 283 Wis. 2d 639, 700 N.W.2d 98); see also State v. Machner, 92 Wis. 2d 797, 805-06, 285 N.W.2d 905 (1979); McCallum, 208 Wis. 2d at 473.

¶32 If a defendant satisfies those four criteria, then "the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." Avery, 345 Wis. 2d 407, ¶25 (citing McCallum, 208 Wis. 2d at 473). "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." Id. (citing Love, 284 Wis. 2d 111, ¶44).

¶33 A claim of newly discovered evidence[4] that is based on recantation also requires corroboration of the recantation with additional newly discovered evidence. McCallum, 208 Wis. 2d at 476. As we have explained, "[r]ecantations are inherently unreliable." Id. (citing Dunlavy v. Dairyland Mut. Ins. Co., 21 Wis. 2d 105, 114, 124 N.W.2d 73 (1963)). Therefore, corroboration requires newly discovered evidence that "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation." Id. at 478; see also Zillmer, 39 Wis. 2d

---

[4] Although as we explain below, the evidence at issue does not fully meet the definition of recantation evidence, a corroboration analysis does provide a useful framework for discussing the evidence presented.

17

at 616 (concluding that "a new trial may be based upon an admission of perjury if the facts in the affidavit are corroborated by other newly discovered evidence").

C. Application

1. Cumulative

¶34 It is clear that McAlister has satisfied the first three requirements necessary to secure an evidentiary hearing based on newly discovered evidence.[5] However, whether the affidavits satisfy the fourth requirement necessary to qualify as newly discovered evidence is unclear; i.e., whether the affidavits are cumulative of trial evidence that attacked Jefferson's and Waters' credibility.

¶35 The court of appeals concluded that the affidavits submitted by McAlister were "merely an attempt to retry the credibility of Waters and Jefferson, whose credibility was well-aired at trial." State v. McAlister, No. 2014AP2561, unpublished order (Wis. Ct. App. Aug. 10, 2016).

¶36 McAlister asks us to ignore the court of appeals' decision and recognize that the State has conceded that McAlister met the first four requirements of his newly

---

[5] The first three requirements are: (1) the evidence contained in the written affidavits was not discovered until after McAlister's conviction; (2) McAlister was not negligent in failing to seek this evidence; and (3) the affidavits are material to whether McAlister participated in the armed robberies. State v. Avery, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60.

18

discovered evidence claim.[6] However, whether alleged newly discovered evidence is cumulative forms part of our legal determination of whether a jury considering the old and new evidence would have a reasonable doubt as to McAlister's guilt. Avery, 345 Wis. 2d 407, ¶25. We are not required to accept the State's concession. State v. Gomaz, 141 Wis. 2d 302, 307-08, 414 N.W.2d 626 (1987). Accordingly, we do not.[7]

¶37 We have long held that newly discovered evidence that is merely cumulative is not grounds for a new trial. Lock v. State, 31 Wis. 2d 110, 116, 142 N.W.2d 183 (1966). Newly discovered evidence is cumulative where it tends to address "a fact established by existing evidence." State v. Thiel, 2003 WI 111, ¶78, 264 Wis. 2d 571, 665 N.W.2d 305 (citing Washington v. Smith, 219 F.3d 620 (7th Cir. 2000)); see also Wilson v. Plank, 41 Wis. 94, 98 (1876) (stating that newly discovered evidence in the form of witness testimony is merely cumulative where it "tends to prove propositions of fact which were litigated at trial").

¶38 Notwithstanding the above principles applicable to evaluating newly discovered evidence, defining when such

---

[6] "The State concedes that McAlister has met the first four requirements [for newly discovered evidence]." State's Br., 18 n.5.

[7] We are always disappointed when counsel concedes a difficult issue, as counsel for the State has done here. The sorting out of difficult legal questions is where we most need counsel's thoughtful assistance.

19

evidence is cumulative is difficult because the definition of cumulative evidence turns to some degree on how the trial issue is described. For further guidance, we look to federal courts, who also evaluate when newly discovered evidence is cumulative. See 33 Fed. R. Crim. P.

¶39 In regard to motions for a new trial based on newly discovered evidence, the United States Supreme Court has long concluded that newly discovered evidence that is cumulative will not support a motion for a new trial. The Court has defined cumulative evidence as, "additional evidence of the same general character, to some fact or point, which was subject of proof before." Southard v. Russell, 57 U.S. 547, 554 (1853). Recantation testimony is often termed cumulative because it "serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Dobbert v. Wainwright, 468 U.S. 1231, 1234 (1984). Where the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative. United States v. Champion, 813 F.2d 1154, 1171 (11th Cir. 1987) (concluding that evidence bearing on the credibility of a witness impeached at trial is cumulative).

¶40 Here, McAlister submitted a 2012 affidavit from Prince about statements he claims that Jefferson made to Prince prior to May 25, 2007; a 2013 affidavit from Shannon in which Shannon relates what he says that Jefferson told him in 2006; and a 2013 affidavit from McPherson about statements he claims to have

20

heard Waters make in 2006. Each affiant swears that, at some point prior to McAlister's January 2007 trial, Jefferson or Waters admitted their plan to perjure themselves at trial to secure a plea bargain that would provide less imprisonment for crimes to which they pled.

¶41 Jefferson testified to the attempted armed robbery of the Credit Union, which he said that McAlister planned. Jefferson said that he and McAlister's niece, Monique, participated in that attempted robbery. He testified that McAlister drove him and Monique to the Credit Union in a four-door gray Hyundai. He said that McAlister instructed him to carry a .22 semiautomatic handgun, which McAlister provided.

¶42 Jefferson also described the armed robbery of Title Loan, in which he, Waters and Monique participated. Jefferson said that McAlister again drove the participants to the scene of the robbery in a gray Hyundai. Jefferson testified that Waters carried the same gun that McAlister had provided to him for the attempted robbery of the Credit Union. After the Title Loan robbery, Jefferson described going to McAlister's house, which was a two-family house where McAlister had the upper floor apartment.

¶43 Jefferson testified that he was offered "consideration" from the district attorney's office for providing truthful testimony about the robberies. Jefferson confirmed that he had been charged with an armed robbery and an attempted armed robbery. He said that if he pled to attempted

21

armed robbery and testified at trial, the armed robbery would be read-in, the sentence enhancers would be dismissed and the State would recommend less prison time. Jefferson further explained that before he had a plea offer he had relayed the same information about the robberies and McAlister's involvement to police. He had asked them for consideration for his testimony and the officers said they could not do that.

¶44 On cross-examination, Jefferson acknowledged that the effect of his plea agreement was to reduce his exposure for imprisonment from a potential maximum of 60 years to a potential maximum of 20 years. He also acknowledged that the district attorney would recommend less prison time because he cooperated. Jefferson said that he was on probation or extended supervision when he committed the crimes, and that he cooperated with the officers because he was concerned about his probation getting revoked and he thought that they might help him.

¶45 Before the jury, both the prosecutor and McAlister's attorney repeatedly probed Jefferson's credibility and fully laid out the terms of the plea agreement that Jefferson believed he had been offered for testifying against McAlister. The jury had to consider whether Jefferson had testified truthfully, or whether his testimony was in response to the State's offer of a lower sentence on his convictions if he testified against McAlister.

¶46 Both Prince's and Shannon's affidavits assert that McAlister was not involved in armed robberies with Jefferson,

22

and that Jefferson framed him to get a plea bargain that would yield a favorable sentencing recommendation. These allegations are of the same general character, and to the same point for which testimony was elicited at trial, i.e., whether Jefferson's testimony that McAlister was involved in the armed robberies was truthful or whether he testified falsely to get a favorable plea bargain.

¶47 Moving on to McPherson's affidavit, it focuses on Waters' testimony and asserts that Waters lied about McAlister's involvement in the armed robberies to get a favorable plea bargain. As with Jefferson, Waters was questioned repeatedly about the specifics of McAlister's involvement, from getting picked up in McAlister's gray Hyundai, to picking up Jefferson and Monique, to providing the .22 semiautomatic gun that Waters carried.

¶48 McAlister's attorney questioned Waters about his repeated lying to authorities on many occasions, in regard to other matters as well as in regard to armed robberies. He attempted to show that Waters did not have a character for truthfulness, but rather, lied whenever it suited his purposes. He also elicited Waters' agreement that he talked to police officers and was testifying against McAlister with the hope of receiving a lesser sentence for the crimes to which he pled.

¶49 Waters acknowledged that he faced substantial imprisonment for the crimes to which he pled and that he hoped his testimony at McAlister's trial would help him. Once again,

23

the statements attributed to Waters in McPherson's affidavit are additional statements of the same general character and to the same point that was subject to proof at trial: Waters is a repetitive liar; his testimony that McAlister was involved in the robbery is not believable. The jury heard it all before. The McPherson affidavit is cumulative because it was drawn to the same point, i.e., that Waters' testimony was given in exchange for a lesser sentence for his own crimes. This is the same evidence that was presented to the jury.

¶50 Accordingly, given the testimony at trial, the three affidavits were of the same general character and drawn to the same point, Jefferson and Waters lied about McAlister to benefit themselves; therefore, the affidavits are cumulative. McAlister did not satisfy the fourth requirement necessary to qualify as newly discovered evidence.

¶51 Our conclusion that the affidavits of McPherson, Prince and Shannon are merely cumulative evidence of the same general character and drawn to the same point for which proof was provided at trial, i.e., that Jefferson and Waters lied to benefit themselves, is sufficient to affirm the court of appeals. See Avery, 345 Wis. 2d 407, ¶25. However, because the second issue is argued as a recantation issue, which has been uniquely framed and fully briefed, we continue.

## 2. Corroboration

¶52 The affidavits of McPherson, Prince and Shannon, all of which were attested to years after McAlister's trial, aver

that Jefferson and Waters said that they intended to lie at McAlister's trial.[8] Jefferson and Waters allegedly said that they were going to implicate McAlister in robberies in which he did not participate so that they could take advantage of plea bargains regarding robberies in which Jefferson and Waters admitted participation.

¶53 In the usual presentation, a recantation occurs when a witness formally or publically withdraws or renounces prior statements or testimony. Black's Law Dictionary 1382 (9th ed. 2009). However, it is argued here that the affidavits presented after McAlister's trial contain recantation testimony, even though the witnesses' statements allegedly were made before they testified at trial.

¶54 The evidence here differs from classic recantation testimony in the temporal sense described above and also because there was no formal or public renunciation of Jefferson's or Waters' testimony. Instead, the statements allegedly were made while Jefferson and Waters were incarcerated with one or more of the affiants, who relayed the statements. There is no writing signed by either Jefferson or Waters.

¶55 However, the affidavits bear a similarity to recantation evidence in that they use what is claimed to be Jefferson's and Waters' own words to allege they lied at trial. Stated otherwise, as with classic recantation, the witnesses'

---

[8] McPherson alleges to have spoken with Waters; Prince and Shannon allege to have spoken with Jefferson.

25

statements are presented after the witnesses' trial testimony and attack the veracity of the witnesses' own testimony.

¶56 When testimony that is classic recantation testimony is presented as newly discovered evidence, we require that the alleged recantation "be corroborated by other newly discovered evidence." McCallum, 208 Wis. 2d at 476. "Corroboration is required because recantation is inherently unreliable; the recanting witness is admitting he or she lied under oath. Either the original testimony or the recantation is false." Gehin v. Wis. Grp. Ins. Bd., 2005 WI 16, ¶98, 278 Wis. 2d 111, 692 N.W.2d 572. We conclude that no less should be required as we assess the affidavits presented in the case before us.

¶57 As explained above, when newly discovered evidence is based on recantation, the defendant must satisfy an additional proof. "[N]ewly discovered recantation evidence must be corroborated by other newly discovered evidence." McCallum, 208 Wis. 2d at 476. "[T]he degree and extent of the corroboration required varies from case to case based on its individual circumstances." Id. at 477; see, e.g., Rohl v. State, 64 Wis. 2d 443, 453, 219 N.W.2d 385 (1974) (citing Zillmer, 39 Wis. 2d at 616).

¶58 Corroboration requires newly discovered evidence of both: (1) a feasible motive for the initial false statement; and (2) circumstantial guarantees of the trustworthiness of the recantation. McCallum, 208 Wis. 2d at 477-78.

¶59 Here, McAlister has failed both corroboration requirements. First, he has failed to present newly discovered motives for Jefferson's and Waters' initial testimony, which he claims is false. Jefferson and Waters clearly wanted to obtain plea bargains that would reduce their imprisonment time, but this motive was fully explored at trial and is not newly discovered.

¶60 Second, McAlister has not provided newly discovered evidence to support circumstantial guarantees of trustworthiness of the affiants or of the alleged statements. To the contrary, the length of time that passed between McAlister's trial and the submission of the affidavits cuts against concluding that the affidavits are trustworthy. Herrera v. Collins, 506 U.S. 390, 417 (1993) (concluding that "[n]o satisfactory explanation has been given as to why the affiants waited until the 11th hour . . . to make their statements."). Here, McPherson, Prince and Shannon waited between five and one-half and seven years after Jefferson and Waters allegedly said that they were going to commit perjury. No newly discovered evidence supports this delay.

¶61 Furthermore, as the Seventh Circuit has noted, recantations made while in jail are "highly suspicious." United States v. Walker, 25 F.3d 540, 549 (7th Cir. 1994). Here, Jefferson and Waters were incarcerated when they allegedly said they were going to frame McAlister. Also of interest, all three affiants were incarcerated, and two, McPherson and Shannon, had

27

been sentenced to life without the possibility of parole. Accordingly, they could face no actual, additional incarceration if found guilty of perjury for the affidavits they signed. And finally, none of the affidavits mentions Monique, McAlister's niece, and Shannon's affidavit affirmatively asserts that Jefferson told him that he and Waters were the only participants in the robberies. However, trial testimony clearly shows Monique's active participation in the robberies.

¶62 McAlister argues that despite the lack of newly discovered evidence supporting circumstantial guarantees of trustworthiness, the three affidavits satisfy an alternative means of showing corroboration. Specifically, McAlister argues that the three affidavits corroborate each other because they agree as to the basic facts: (1) McAlister was not involved in the charged robberies; and (2) Jefferson and Waters nonetheless sought to frame him for those robberies to reduce the consequences of their own misconduct. We are not persuaded. The three partially-overlapping affidavits do not fulfill the standards set forth in McCallum and all suffer from the same lack of a newly discovered evidence of motive for Jefferson and Waters to lie, as well as the same deficits in regard to trustworthiness.

¶63 Accordingly, we conclude that the alleged statements of Jefferson and Waters that attempt to withdraw the truthfulness of their testimony at McAlister's trial have not been corroborated. Therefore, the circuit court had sound

28

reasons to exercise its discretion and to deny McAlister's motion for a new trial without an evidentiary hearing.  *Avery*, 345 Wis. 2d 407, ¶22.

### III.  CONCLUSION

¶64  We conclude that the affidavits were merely cumulative evidence because they were additional evidence of the same general character as was subject to proof at trial, i.e., Jefferson and Waters lied when they implicated McAlister in order to achieve favorable plea bargains for themselves.  We also conclude that the affidavits were insufficient to require the circuit court to hold a hearing on McAlister's motion for a new trial because they were supported by neither newly discovered corroborating evidence or circumstantial guarantees of trustworthiness.  Therefore, the circuit court did not erroneously exercise its discretion when it denied McAlister's motion for a new trial without an evidentiary hearing.  Accordingly, we affirm the court of appeals' affirmance of the circuit court.

*By the Court.*—The decision of the court of appeals is affirmed.

¶65 DANIEL KELLY, J. *(concurring).* I join the court's opinion except for its conclusion that the evidence offered by Mr. McAlister is cumulative. I agree with the court's observation that "defining when such evidence is cumulative is difficult," majority op., ¶38, but a fairly straightforward test can establish that the evidence here cannot be so characterized.

¶66 The point of evidence is to give the trier of fact the raw material upon which to exercise his judgment in deciding whether a particular fact is true. We presume he will act in good faith, and will conclude that a fact is true if presented with sufficient credible evidence. It's easy enough to say that anything beyond this quantum is cumulative. The tricky part is determining whether new evidence is cumulative when the fact finder has already determined the old evidence was insufficient to establish the contested fact.

¶67 There is, however, a test that can unmistakably identify new evidence as non-cumulative, and we should have applied it here. It is this: If the trier of fact were to believe the new evidence, would he necessarily conclude the disputed fact has been established? If so, then the new evidence cannot possibly be cumulative because it is capable of producing a result the old evidence did not. I suspect it will be a rare piece of information that will satisfy this criterion, in which case other "cumulativeness" tests may be employed. But evidence that <u>does</u> meet this standard definitively answers the cumulativeness question.

1

¶68 Mr. McAlister has presented such information here. At trial, he introduced evidence suggesting that Messrs. Jefferson and Waters had a strong motivation to falsely accuse him of involvement in the crimes. The jurors could have believed this evidence——that is, they could believe the witnesses had good reason to lie——and nonetheless conclude that, upon the event, they told the truth. The result of the trial suggests this is, in fact, what they did.

¶69 Mr. McAlister's new evidence is not of the same nature. The affidavits he now presents claim that Messrs. Jefferson and Waters admitted they made up a story about Mr. McAlister's involvement in the crimes. If the jurors were to credit this new evidence, they could not simultaneously believe that Messrs. Jefferson and Waters' trial testimony was truthful. That is to say, the new evidence is capable of producing a result the old evidence did not. Therefore, it cannot be cumulative.

¶70 Nevertheless, I agree with the court's conclusion that this evidence requires corroboration before Mr. McAlister is entitled to an evidentiary hearing on his request for a new trial. This new information is in the nature of "recantation" evidence (for which we have always required corroboration), even though it presents as a pre-existing decision to commit perjury rather than a post hoc confession. The justification for requiring corroboration is the same——the inherent unreliability of what often looks like a grown-up version of Kipling's "just-so" stories.

2

¶71 There is one other aspect of the court's opinion that bears comment. The court took the State to task for conceding that Mr. McAlister's new evidence is not cumulative: "We are always disappointed when counsel concedes a difficult issue, as counsel for the State has done here." Id., ¶36 n.7. I disagree.

¶72 One of the distinguishing characteristics of an accomplished and wise advocate is knowing when to concede a point. And, having come to the realization that a previously-defended position is not actually defensible, it takes courage and humility to say so. This is the type of candor we should be encouraging, not condemning. Just because the court (mistakenly, in my view) disagrees with the State's position does not mean the State conceded for some reason other than its professional, good faith assessment of the issue's merits. And yet the court's rebuke implies that very thing. However, institutional litigators (like the State) should make certain that a concession truly is the result of a good faith assessment of the issue's merits, and not an attempt to steer the court away from issues it would prefer not to address.

¶73 I respectfully concur.

3

¶74 ANN WALSH BRADLEY, J. *(dissenting).* A jury found David McAlister guilty of several crimes. Now, with sworn affidavits in hand, he asserts that he has newly discovered evidence that his accomplices planned in advance to lie on the stand during his trial to falsely implicate him. The majority denies him an evidentiary hearing on his claim that he "was not, in fact, involved in the offenses for which he was convicted . . . ."

¶75 The issue in this case is not whether McAlister's conviction should be vacated, or whether he should receive a new trial. It is merely whether he should be afforded the opportunity for an evidentiary hearing on his postconviction motion.

¶76 Our system of law has always operated under the theory that it is better for ten guilty people to go free than one innocent to languish in prison. See State v. Dubose, 2005 WI 126, ¶51 n.1, 285 Wis. 2d 143, 699 N.W.2d 582 (Butler, J., concurring); Furman v. Georgia, 408 U.S. 238, 367 n.158 (1972) (Marshall, J., concurring) (quoting William O. Douglas, Foreward to Jerome Frank & Barbara Frank, Not Guilty 11-12 (1957)); see also In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring). Yet, the majority opinion strays from this premise, favoring finality. What if McAlister's claims are true? What if his witnesses are credible? We will never know because the majority has short-circuited the process and there will be no hearing.

1

¶77 Not only does the majority misstep by favoring finality over a search for the truth, it also stumbles in three significant ways. First, by refusing to accept the facts alleged as true for purposes of determining whether McAlister is entitled to an evidentiary hearing, the majority deviates from our established case law. See State v. Balliette, 2011 WI 79, ¶18, 336 Wis. 2d 358, 805 N.W.2d 334; State v. Love, 2005 WI 116, ¶¶54-55, 284 Wis. 2d 111, 700 N.W.2d 62. Second, it errs in determining that the new evidence is cumulative of that already presented. Third, it attempts to fit a square peg into a round hole by creating a false equivalency between recantation evidence and the alleged newly discovered evidence at issue here. I address each in turn.

I

¶78 This case revolves around McAlister's claim that his accomplices lied on the stand during his trial. With his postconviction motion, McAlister presented to the circuit court the affidavits of three prison inmates——Wendell McPherson, Corey Prince, and Antonio Shannon.

¶79 Each of the three inmates averred that he had contact with one of McAlister's accomplices, Alphonso Waters or Nathan Jefferson, prior to McAlister's trial. Most significantly, the affidavits indicate that Waters and Jefferson stated that they planned to lie in an effort to implicate McAlister.

A

¶80 The majority errs first by failing to adhere to precedent. It denies McAlister a hearing when the facts, accepted as true, indicate that McAlister is entitled to relief.

¶81 The question before us is whether McAlister is entitled to an evidentiary hearing, giving him the opportunity to establish that a reasonable probability exists that a different result would be reached at trial. At this stage of the proceedings, we must accept the facts alleged in McAlister's motion as true. See Love, 284 Wis. 2d 111, ¶54. For our purposes, it is not relevant whether the alleged newly discovered evidence is admissible or whether it is credible. Id.

¶82 A court is not to base its decision solely on the credibility of the newly discovered evidence, unless it finds the new evidence to be incredible as a matter of law. State v. Avery, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60. Testimony is incredible as a matter of law or patently incredible if it is in conflict with the uniform course of nature or with fully established or conceded facts. State v. Vollbrecht, 2012 WI App 90, ¶28 n.18, 344 Wis. 2d 69, 820 N.W.2d 443 (citation omitted).

¶83 Love, 284 Wis. 2d 111, presents facts very similar to those here. In Love, the defendant was convicted of armed robbery and subsequently filed a motion for a new trial based on newly discovered evidence. Id., ¶¶19, 21. "Love included an affidavit from Christopher Hawley, who claimed to have met

3

another inmate, Floyd Lindell Smith, Jr., while at Green Bay Correctional Institution. Hawley averred that Smith admitted to robbing [the victim] and shared in-depth details regarding the incident." Id., ¶21. The circuit court denied the motion without an evidentiary hearing. Id., ¶23.

¶84 This court remanded for an evidentiary hearing. Id., ¶56. Like this case, Love turned on the reasonable probability prong of the newly discovered evidence test. Id., ¶¶52-53. The Love court accepted the facts as alleged in Love's postconviction motion as true for purposes of its analysis:

> Love's postconviction motion indicates that Hawley would testify that Love was not the assailant. Hawley will testify that Smith (or if Love can get Smith to testify, then it would be Smith's testimony that he) committed this crime. Whether that testimony is ultimately admissible is not relevant for our purposes here. Whether that testimony is credible is not relevant for our purposes here. It must be accepted as true.

Id., ¶54 (emphasis added).

¶85 Accepting Love's alleged facts as true, the court determined that Love was entitled to an evidentiary hearing. It explained:

> If it is true, then the evidence against Love amounts to [the victim's] identification against another's assertion that Smith committed the crime. Thus, viewing the new evidence, particularly in light of the identification discrepancies, there is a reasonable probability that a jury, looking at both, would have a reasonable doubt as to Love's guilt.

Id., ¶55.

¶86 The only material factual difference between this case and Love is the timing of the alleged statements——the affidavits

4

here relate to an admission of <u>future</u> perjury, while in <u>Love</u> the affidavit related to an alleged admission to a <u>past</u> crime. In both cases, the affiant was a fellow inmate. As in <u>Love</u>, I would accept the alleged facts as true.

¶87 In his postconviction motion, McAlister alleged that "[l]ong after McAlister's direct appeal and after he filed his petition for writ of habeas corpus, he learned that Corey Prince, Wendell McPherson and Antonio Shannon had information confirming that McAlister was not involved in any robberies and that the State's two key witnesses against him, Alphonso Waters and Nathan Jefferson had conspired to frame McAlister in order to obtain relief from their own sentences."

¶88 Instead of accepting McAlister's alleged facts as true, the circuit court here stated orally that the affidavits are "inherently not believable." In its written order, it likewise concluded that they "have limited credibility." The circuit court thus went well beyond its role at this stage of proceedings, engaging in a personal, subjective assessment of witness credibility rather than accepting the facts presented as true.

¶89 The majority turns a blind eye to the circuit court's error and again delves into the credibility of the affiants' statements. In its misguided search for "circumstantial guarantees of trustworthiness," the majority laments that "the length of time that passed between McAlister's trial and the submission of the affidavits cuts against concluding that the affidavits are trustworthy." Majority op., ¶60. It further

5

decries the "highly suspicious" nature of jailhouse statements made by those serving life sentences. Id., ¶61.

¶90 This inquiry goes beyond the court's role based on the procedural posture with which we are presented. Properly leaving a credibility determination for a later date, the court's only determination here should be whether the McPherson, Prince, and Shannon affidavits are incredible as a matter of law.

¶91 I conclude that they are not. The statements are not so outlandish as to be in conflict with the "uniform course of nature." See Vollbrecht, 344 Wis. 2d 69, ¶28 n.18. Without an evidentiary hearing we simply do not know if the affidavits are credible. Accordingly, I would accept the alleged facts as true and determine that McAlister should be afforded the opportunity for an evidentiary hearing.

B

¶92 The majority errs next by determining that the newly discovered evidence is merely cumulative of that already presented. It reaches this conclusion because "[t]he jury heard it all before." Majority op., ¶49. According to the majority, the alleged newly discovered evidence is "of the same general character and drawn to the same point for which proof was provided at trial, i.e., that Jefferson and Waters lied to benefit themselves[.]" Id., ¶51.

¶93 What was the "character" of the evidence offered? At trial, both Jefferson and Waters were cross examined regarding deals they made with the district attorney. See majority op.,

6

¶¶9-11, 16. In each case, the district attorney agreed to recommend less prison time in exchange for their testimony. Id., ¶¶11, 16. This evidence could certainly offer a <u>motive</u> for Waters and Jefferson to lie and implicate McAlister, but it says nothing about whether Waters and Jefferson <u>in fact</u> conspired to frame McAlister.

¶94 In contrast, the affidavits of Prince, McPherson, and Shannon, if true, offer direct evidence that Waters and Jefferson conspired to lie.[1] Direct evidence that Jefferson and Waters planned to lie is of a different general character than the circumstantial evidence of their motive to lie that was presented at trial. As McAlister aptly states in his brief, "evidence that Jefferson and Waters in fact conspired to frame McAlister is not cumulative to evidence that they had a motive to do so."

C

¶95 The majority's third error lies in its attempt to fit a square peg into a round hole by creating a false equivalency between recantation evidence and the alleged newly discovered evidence in this case.

¶96 Recantations are inherently unreliable. <u>State v. McCallum</u>, 208 Wis. 2d 463, 476, 561 N.W.2d 707 (1997) (citing

---

[1] That there was no direct evidence of a conspiracy presented at trial was repeatedly highlighted by the prosecutor during closing argument. The State's closing argument was peppered with statements such as, "[t]here's no evidence they ever met and talked about it" and "there is no evidence they ever even talked." If true, the McPherson, Prince, and Shannon affidavits do provide such evidence.

7

Dunlavy v. Dairyland Mut. Ins. Co., 21 Wis. 2d 105, 114, 124 N.W.2d 73 (1963)). "The recanting witness is admitting that he or she has lied under oath. Either the original sworn testimony or the sworn recantation testimony is false." McCallum, 208 Wis. 2d at 476. This is the reason behind the corroboration requirement for recantation testimony. Gehin v. Wis. Group Ins. Bd., 2005 WI 16, ¶98, 278 Wis. 2d 111, 692 N.W.2d 572.

¶97 Contrary to the majority's assertion, the evidence at issue here is not akin to recantation evidence. The alleged "recantation" is not the product of the witnesses who are alleged to have lied on the stand, Jefferson and Waters. Rather, the alleged "recantation" statements are from three individuals who did not previously testify in this case. By definition, a recantation must consist of the witness withdrawing or renouncing prior testimony. See McCallum, 208 Wis. 2d at 476. Neither Waters nor Jefferson has submitted an affidavit recanting his trial testimony.

¶98 Consequently, the logic of the corroboration rule does not hold here. As we explained in McCallum, in the recantation situation "[t]he recanting witness is admitting that he or she has lied under oath. Either the original sworn testimony or the sworn recantation testimony is false." McCallum, 208 Wis. 2d at 467. Here, the alleged "recantations" of Jefferson and Waters were not made under oath. There is no sworn "recantation" testimony from the "recanters." The "either/or" situation described in McCallum is not present here because Jefferson and

8

Waters each made only one statement under oath——his trial testimony.

¶99 The statements at issue are better characterized as prior inconsistent statements rather than a "recantation." A prior inconsistent statement is not "inherently unreliable" as is a recantation. To the contrary, a prior inconsistent statement is reliable enough to constitute a non-hearsay statement. See Wis. Stat. § 908.01(4)(a)1. The majority's attempt to force the evidence here within the category of "recantation" evidence is simply unconvincing.

II

¶100 If a Wis. Stat. § 974.06 motion raises sufficient facts that, if true, show that the defendant is entitled to relief, the circuit court must hold an evidentiary hearing. Balliette, 336 Wis. 2d 358, ¶18. The sworn affidavits assert that witnesses lied and McAlister maintains he was not involved in the offense for which he was convicted. Accepting the facts as alleged in McAlister's motion as true, I conclude that McAlister has shown he is entitled to relief. I therefore would reverse the court of appeals and remand to the circuit court for an evidentiary hearing.

¶101 Accordingly, I respectfully dissent.

¶102 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

9