COURT OF APPEALS
DECISION
DATED AND FILED

July 15, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP510**

Cir. Ct. No. 2012CF558

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

KA YENG XIONG,

    DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Marathon County: GREGORY J. STRASSER, Judge. *Reversed and cause remanded for further proceedings.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Ka Yeng Xiong appeals from an order that denied his motion for a new trial based on newly discovered evidence, without holding an evidentiary hearing.  We reverse the order and remand for further proceedings because we conclude that Xiong was entitled to an evidentiary hearing on his claim of newly discovered evidence.

## BACKGROUND

¶2     Police reports attached to a complaint alleged that, on August 5, 2012, Xiong shot at two people who were sitting in a vehicle outside his house and that some of the bullets entered nearby houses.  Based on those allegations, the State charged Xiong with two counts of attempted first-degree intentional homicide, four counts of reckless endangerment, one count of possession of a firearm by a felon, and two counts of damage to property, with several penalty enhancers.

¶3     At a trial held the last week of August 2013, Ted and Cole[1] testified that Ted and Xiong had exchanged heated words earlier in the evening on the day of the shooting incident, after Ted and Xiong's vehicles passed one another.  At the time of the exchange, Ted and Cole saw that Xiong had a 9mm gun.  Following the verbal exchange, Ted and Cole said they switched to Cole's black SUV, grabbed some brass knuckles and a police baton, and then drove over to where they believed Xiong lived, looking to fight.

¶4     After slowly driving by several times, Cole parked his vehicle in front of Xiong's house.  Ted and Cole both testified that Xiong approached them carrying a gun and fired the gun multiple times at Cole's vehicle, causing the vehicle's

---

[1] This matter involves the victims of a crime.  Pursuant to WIS. STAT. RULE 809.86(4) (2023-24), we use pseudonyms instead of the victims' names.

windows to shatter. Ted and Cole also each acknowledged that they had initially told police that they did not know who the shooter was because they wanted to handle the matter themselves.

¶5 A witness, Scott Gray, testified that shortly after the gunshots awoke him, he saw two men get into separate vehicles that had been parked near Xiong's house, then each drive away. The vehicles matched descriptions of those belonging to, or being used by, two of Xiong's friends, Jason Helding and Kristopher Torgerson.

¶6 Prior to trial, Xiong obtained an affidavit from a jail inmate, Joshua Huff, who asserted that Helding had confessed to committing the shooting. Huff was unavailable to testify at trial, however, because by then he was in custody in Iowa on unrelated charges. The circuit court excluded Huff's affidavit from evidence upon concluding that it constituted inadmissible hearsay without substantial guarantees of reliability.

¶7 Helding testified under a grant of immunity. He stated that he left Xiong's house just before the incident and heard gunshots as he drove away, but he did not see who did the shooting. Helding denied having told Huff that he was the shooter, and Torgerson testified that, due to heavy drug use, he had no recollection of the incident.

¶8 Several other witnesses testified to having heard the gunshots, but they did not see who did the shooting.

¶9 Xiong did not testify. During closing arguments, his attorney argued to the jury that either Helding or Torgerson was the actual shooter. The jury found Xiong guilty on all counts.

3

¶10     Ten years after his conviction, Xiong moved for a new trial based upon newly discovered evidence. Xiong submitted ten signed affidavits in support of his motion, in addition to his own affidavit.

¶11     Katherine Radandt, who had known Helding since the sixth grade, averred that Helding had admitted to her that he was the actual shooter during a car trip they took together in the fall of 2012.

¶12     Matthew White, who was housed in the Marathon County Jail in the summer and fall of 2012, averred that Helding had confessed to White during that time that he was the actual shooter.

¶13     Tou Yang, who was a neighbor of Xiong's and a friend of Helding's, averred that shortly after Yang heard the shots, Helding pulled up to Yang's house, jumped out of his vehicle acting excited and nervous, and twice stated, "I just shot [Cole] and them." Helding handed Yang a Glock that he had used in the shooting, and Yang temporarily hid it for him. Helding later told Yang over the phone that he had emptied the entire clip in his gun on Cole. Subsequently, Yang, his wife, and Helding went to a wooded spot near a casino where Helding hid the gun. Yang said that the police never reached out to him, and he did not reach out to them because he did not trust them.

¶14     Kao Vang, Yang's wife, averred that shortly after she heard "bang, bang, bang" noises, Helding arrived at their house, told her and her husband that he had just shot up a vehicle, and gave her husband a gun to hide. Vang subsequently drove her husband and Helding to a wooded spot to hide the gun. Vang said she did not come forward at the time because she had young children and did not want to get involved.

¶15     Angus Buhse averred that, the day after the shooting, Helding bragged to Buhse about having fired rounds at a black SUV. Buhse did not come forward at the time because he was on probation and did not want to contact law enforcement. However, after Xiong's trial, Buhse made a recording of himself, Helding, Bee Yang, and Maxwell Philavanh discussing the incident and the trial. Helding made a series of incriminating statements such as, "[a]ll we can do is hope he beats his fucking appeals and if he doesn't don't worry [I]'ll fucking snitch myself out and go on the fucking run," "I changed my whole fucking statement just because [Xiong said he was sleeping at the time of the incident]," "[t]hey know it wasn't him," and, "[t]hey would have gave him 10 for his reckless endangerment of safety and his possession of a firearm and I would have gotten 22."

¶16     Jake Jones averred that while he and Helding were both in jail in 2012, Helding had confessed to having actually pulled the trigger during the Xiong incident. Later, in 2014, Helding told Jones that Xiong was a snitch and that Xiong should be thanking Helding for saving his life.

¶17     John Vang averred that, in August 2013, Helding met up with Vang in Appleton and told Vang that he needed to get out of Wausau and lay low for a while because he had opened fire on a vehicle in front of Xiong's house.

¶18     Ericka Bowman averred that she asked Helding in November 2012 why Helding let Xiong take the fall for him. Helding responded that Xiong had "told on him first" in a presentence investigation report.

¶19     Maxwell Philavanh averred that Helding told him two or three days after the incident that Helding had been the one to shoot at the vehicle, with a gun Xiong had given him. Helding also told Philavanh that Torgerson was present during the shooting, but Xiong was inside.

¶20    Charles Knapp averred that he was a private investigator who had been hired by Xiong in November 2022 to investigate potential avenues for postconviction relief.  Knapp interviewed Cole's wife, who said that shortly after the trial, Cole and Ted were laughing about having identified Xiong because they knew he was not the shooter.  Cole's wife said that she was afraid of retaliation if she came forward.

## DISCUSSION

¶21    In order to obtain a hearing on a postconviction motion, a defendant must allege material facts sufficient to warrant the relief sought.  *State v. Allen*, 2004 WI 106, ¶¶9, 36, 274 Wis. 2d 568, 682 N.W.2d 433.  More specifically, when seeking a new trial based upon newly discovered evidence, the allegations, if proven, must establish that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative; and, assuming those four factors are met; (5) there is a reasonable probability that a different result would be reached at trial.  *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42.  The sufficiency of the allegations to warrant a hearing is a question of law that this court reviews de novo.  *Allen*, 274 Wis. 2d 568, ¶9.

¶22    Regarding the first element, the State argues that none of the affidavits Xiong presented provide newly discovered evidence because they all relate to a contention Xiong was already aware of at the time of trial—namely, that Helding was the shooter.  The State cites *State v. Jackson*, 188 Wis. 2d 187, 199, 525 N.W.2d 739 (Ct. App. 1994), for the proposition that the new "availability" of testimony about a previously known fact does not constitute "discovery" of new evidence.

6

¶23 We are not persuaded that this case is analogous to *Jackson*, however. In *Jackson*, the issue was whether a co-defendant's testimony could be deemed "newly discovered" when the defendant *was aware of the testimony* at the time of trial, but he was unable to present it because the co-defendant refused to testify on Fifth Amendment grounds. *Id.* at 197. We note that having knowledge of a fact that a defendant believes to be material to his case is not the same as having knowledge about specific *testimony or other evidence that could be used to establish that fact*. There is nothing in the affidavits to suggest that Xiong was aware, prior to his trial, that any of the ten people who provided postconviction affidavits on his behalf had relevant testimony he could use to establish that Helding was the shooter.

¶24 Regarding the second element, the State argues that Xiong was negligent in discovering the testimony provided in the affidavits because—according to Xiong's own statement to a presentence investigator—Xiong gave Helding the gun to go outside and check on matters after seeing Cole's vehicle go past his house on surveillance video. Xiong thus knew all along that Helding was the shooter, but he did not tell police or his own attorney what had really happened (at least initially) because Xiong's gun was used in the shooting and he did not want to get himself or his friends in trouble.

¶25 The State's argument fails to acknowledge the significance of several key facts. First, Xiong sought an adjournment five months prior to trial for the explicit purpose of trying to find other inmates to whom Helding might have spoken. The State does not explain why that investigation does not constitute due diligence. Second, the materials in the record provide no basis to believe that Xiong knew where Helding went after leaving the scene of the crime or what Helding did with the gun. It is therefore unclear why Xiong would have had any reason to interview Tou Yang and Kao Vang prior to trial, or why the couple—who were Helding's

7

friends—would have been forthcoming to Xiong at that time. Third, even assuming that a more diligent pretrial investigation would have identified some or all of the witnesses who could testify about pretrial incriminating statements or events, it would have been impossible for Xiong to discover, prior to his trial, that Helding made additional incriminating statements to multiple people *after* the trial, or that Ted and Cole laughed after the trial about having falsely identified Xiong as the shooter.

¶26    We conclude that Xiong could not, as a matter of law, have been negligent in obtaining witness testimony about statements or events that occurred after trial. *See, e.g., State v. Vollbrecht*, 2012 WI App 90, ¶¶20-21, 344 Wis. 2d 69, 820 N.W.2d 443 (defendant was not negligent in failing to discover prior to trial inculpatory statements made by a third party after trial). Furthermore, determining whether Xiong was negligent in obtaining any testimony that might have been available before the hearing requires factual findings as to what efforts Xiong took. Xiong therefore should be allowed to present evidence at a hearing as to what efforts he or his investigator made to obtain witness testimony about statements or events that occurred prior to trial.

¶27    Regarding the third element, the State does not dispute that the identity of the shooter was material to an issue in the case.

¶28    Regarding the fourth element, the State asserts that "[w]here the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative." *State v. McAlister*, 2018 WI 34, ¶39, 380 Wis. 2d 684, 911 N.W.2d 77. The State argues that the testimony proffered in the postconviction affidavits is merely cumulative of Xiong's attempt to undermine Helding's testimony at trial. We disagree for several reasons.

¶29     First, no one at trial testified that Helding made incriminating pretrial statements to Radandt, White, Tou Yang, Kao Vang, Buhse, Jones, John Vang and Philavanh; that Helding made incriminating postconviction statements to Buhse, Bee Yang, Philavanh, and Bowman; that Tou Yang and Kao Vang helped Helding hide the gun used in the shooting; or that Ted and Cole were laughing after the trial about having falsely identified Xiong as the shooter.  Thus, the proffered testimony could not be cumulative of Xiong's prior attempt to undermine Helding's testimony at trial.  Second, while all of the testimony in the affidavits could in some respect undermine Helding's denial of having admitted to being the shooter, the statements served additional purposes as well.

¶30     In addition to undermining Helding's testimony, the statements of Tou Yang and Kao Vang *corroborated* the testimony of Gray, who saw Helding's vehicle leave the scene *after* the shooting, not before, as he had testified.  Tou Yang and Kao Vang's statements also provided independent information about a topic that no one at trial testified about—namely, what happened to the gun used in the shooting.

¶31     Next, the statement Cole's wife provided to Xiong's investigator served to impeach the testimony of Cole and Ted, as well as Helding.  There was no similar impeachment of Cole and Ted at trial.

¶32     Finally, the postconviction statement Helding made to Buhse, Bee Yang, and Maxwell Philavanh that he had "changed his whole fucking statement" and Ted and Cole's reported laughter over having falsely identified Xiong as the shooter, arguably constituted admissions of perjury.  Impeachment evidence may be strong enough to warrant a new trial when it shows that the verdict was based on perjured evidence.  ***Plude***, 310 Wis. 2d 28, ¶47.  The Buhse evidence was

particularly strong because it was backed by a recording of Helding himself making the statements.

¶33   Regarding the fifth element, we are satisfied that a jury hearing at least the postconviction incriminating statements Helding made (if not also the pretrial ones, depending on whether Xiong can show he was not negligent in obtaining them), in conjunction with statements from two people who admitted after trial that they had helped Helding hide the gun, and a statement from the wife of one of the victims who implicated both victims as having committed perjury, could cause a reasonable doubt as to Xiong's guilt if the matter were retried.

¶34   In sum, we conclude that Xiong's allegations, if true, satisfy the test for obtaining a new trial based on newly discovered evidence. Xiong is therefore entitled to a hearing to show that the ten identified witnesses would credibly testify as proffered in their affidavits, and that he was not negligent in obtaining their testimony. In light of our determination that Xiong was entitled to a hearing on his newly discovered evidence claim, we need not address Xiong's alternate argument that he is entitled to a reversal of his conviction in the interests of justice.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).