PER CURIAM.
¶1 Bobby Joe Johnson, Jr., appeals a judgment of conviction and an order denying postconviction relief entered by the Milwaukee County Circuit Court.[1] Shots were fired into a residence, killing Whitney Rhodes. At trial, the State presented testimony from several witnesses, including Johnson's brother, Atoary Harrington, all of whom testified that Harrington and Johnson were both armed and present at the scene of the shooting. Johnson was convicted of second-degree reckless homicide by use of a dangerous weapon as a party to the crime, and possession of a firearm by a felon.
¶2 Johnson filed a postconviction motion and requested a new trial for two reasons. First, Johnson alleged that he had newly discovered evidence in the form of a sworn statement by Harrington in which he recanted his trial testimony and claimed that he, rather than Johnson, fired the shots that killed Rhodes. Second, Johnson alleged that his trial counsel was ineffective because he failed to investigate, and call to testify at trial, persons who claim that they saw Johnson at the scene but that he did not have a firearm, and that they heard Harrington make statements incriminating himself regarding the shooting. The circuit court denied the motion without an evidentiary hearing, and Johnson appeals.
¶3 We conclude that Johnson has failed to provide newly discovered evidence to corroborate Harrington's recantation, and the circuit court properly denied the request for an evidentiary hearing on that claim. We also conclude that Johnson has failed to provide sufficient facts to entitle him to an evidentiary hearing on his ineffective assistance of trial counsel claim. We therefore affirm the judgment of conviction and order of the circuit court.
BACKGROUND
¶4 The following facts are taken from the trial transcript. To place Johnson's arguments on appeal within the proper context, we begin with the trial testimony about the events that precipitated Johnson's arrival at the residence where the shooting occurred. Next, we recount pertinent trial testimony from persons who were present at the scene and trial testimony from a responding officer and an expert witness concerning the weapons used in the shooting.
¶5 Also for context, we repeat that Johnson was convicted of second-degree reckless homicide with a dangerous weapon as a party to the crime. In these circumstances, the elements of that crime can be summarized as follows: Johnson, or a person Johnson was intentionally aiding and abetting, caused Whitney Rhodes' death by use of a dangerous weapon (in this case, a firearm) and by "criminally reckless conduct," which is defined as conduct creating a risk of death or great bodily harm to another person and that risk was unreasonable and substantial. See WIS JI- CRIMINAL 400, 990 and 1022. Johnson was also convicted of possession of a firearm by a felon.
I. Events Prior to the Shooting.
¶6 In August 2013, Rosemary Franklin was celebrating her birthday with friends and family outside her home in Milwaukee. Among the attendees were Franklin's daughters Brittany Hughes, Betina Hughes, Jassmine Mulbah, and Tiffany Mulbah.[2] Also in attendance were Franklin's nephew, Brian Robinson, and the victim, Whitney Rhodes.
¶7 During the party, Bridgette Beasley,[3] who has a child with Johnson, walked up to the residence together with two unidentified women. Two of Franklin's daughters, Brittany and Tiffany, exchanged words and threats with Bridgette and the other women. A fight broke out between the two groups, and eventually Bridgette's group ran away from the Franklin residence.
¶8 A person who saw the fight called Johnson and told him to come to the Franklin residence because Bridgette had been attacked and to "bring the heat" (in other words, to bring guns). Twenty to thirty minutes later, Johnson arrived at the Franklin residence.
II. Testimony Concerning the Shooting.
A. Party Attendees' Testimony.
¶9 Franklin and her daughters Betina, Jassmine, and Tiffany testified at trial. We now recap pertinent trial testimony from those persons concerning events around the time of the shooting.
Tiffany Mulbah.
¶10 Tiffany testified to the following. Franklin was arguing with Johnson and Harrington[4] at the back door of the Franklin home, and Johnson pointed at Franklin and Robinson what "looked to [Tiffany] like a .38 revolver." Harrington also had a gun. Other persons were with Johnson and Harrington, but Tiffany did not see anyone in that group with a gun except Johnson and Harrington.
¶11 Tiffany left the back door area and, about three to four minutes later, gunshots entered through the dining room window on the south side of the Franklin residence. Tiffany heard seven or eight gunshots that she perceived to come from two different firearms at the front and the side of the residence, but she did not see who shot into the dining room.
Betina Hughes.
¶12 Betina testified to the following. Betina went to the back door where she heard arguing and saw Franklin and Robinson, who were arguing with Johnson and Harrington. Five men were with Johnson, including Harrington.
¶13 The Johnson/Harrington group then walked away from the back of the Franklin residence. At some point after that, Betina heard gunshots but did not see who shot, or hear or see where the gunshots came from. Betina saw Johnson and Harrington with guns, but no one else appeared to have a gun.
Jassmine Mulbah.
¶14 Jassmine testified to the following at trial. Franklin, Robinson, Johnson, Harrington, and two other persons were arguing near the back door of Franklin's residence. Johnson, Harrington, and one other person had weapons, but only Johnson's and Harrington's weapons were visible. Both Harrington's gun and the other person's gun looked "more like a police gun," while Johnson's weapon appeared "more like a cowboy gun."
¶15 The Johnson/Harrington group then went toward the front of the residence. A short time later, Jassmine heard gunshots. Rhodes came into the bedroom and said that she had been shot. Jassmine did not see who shot into the residence and did not see anyone shoot from inside the residence.
Rosemary Franklin.
¶16 Franklin testified to the following. After Johnson arrived at Franklin's home, he stayed outside and demanded to know who had hit Bridgette. Johnson then reached into his jacket and pulled out a pistol. Johnson's pistol was "silver with a black handle, a long nose ... like a cowboy gun." By that time Harrington was present at the Franklin residence, and he also had a gun. Franklin did not see any other person with a firearm that day.
¶17 Johnson stayed outside and went to the front of the residence. Franklin then went into her home. At that point, Franklin heard seven or eight gunshots coming from what she believed was the front of the residence but did not see who fired those shots. Franklin was unaware of anyone returning fire from inside the residence.
B. Harrington's Testimony.
¶18 The State also called Harrington as a witness at trial, and he testified as follows concerning the events at the Franklin residence.
¶19 Harrington received a phone call from Bridgette, who said that she had been in a fight and asked him to come to the Franklin residence. When he arrived, Harrington was armed with a semi-automatic gun, but Harrington was unaware of the caliber of the gun. Harrington walked to the back of the residence and saw Johnson and Bridgette yelling at persons inside the residence to come outside and fight.
¶20 When Harrington was standing next to Johnson at the back of the residence, he did not see Johnson with a gun. Harrington first saw Johnson with a firearm after Johnson left the back of the residence and went to the front of the residence. Harrington returned to the front of the residence at the same time as Johnson.
¶21 Multiple persons then came from inside the residence to the front porch, and Bridgette and Johnson went on to the front porch to argue with those persons. While on the porch Johnson displayed a gun, but Harrington did not know what kind of gun Johnson possessed. Harrington remained on the sidewalk at that time.
¶22 Following Johnson's display of a gun on the front porch, Harrington saw a man inside the residence lift a gun, and Harrington thought the man was going to shoot at Johnson and Bridgette. Harrington pulled out his own gun and fired two or three times into the air. Johnson and Bridgette both jumped off the porch and ran southbound, but Harrington did not see where they ended up. Harrington also ran and did not see Johnson. Harrington could not say whether Johnson ran into a "gangway" between Franklin's residence and another home located to the south of Franklin's. Harrington heard more shots after he started running but did not know who fired the shots. The only other persons whom Harrington saw with guns that day were Johnson and the man in the residence.
¶23 Harrington was charged with first-degree reckless homicide by use of a dangerous weapon for his involvement in the shooting. Harrington sent a letter to Johnson's counsel stating that Harrington's previous attorney had told Harrington that "it would be better for you if you said you saw your brother shoot." Harrington retained a different attorney who represented him during negotiations for a plea agreement. Harrington pled guilty to second-degree reckless homicide as a party to the crime. The State agreed to drop the enhancer of using a dangerous weapon and to request prison time, but not a specific amount, at Harrington's sentencing in exchange for Harrington's truthful testimony at Johnson's trial.
C. Police and Expert Testimony.
¶24 The State called as witnesses at trial a responding police officer and an expert who provided the following pertinent testimony.
Detective Matthew Goldberg.
¶25 Detective Matthew Goldberg testified to the following. Two bullet impact points were found in the front wall of Franklin's residence, and two .380 caliber casings were found nearby. Neither of the two front-wall bullet impact points resulted in a bullet penetrating inside the residence, meaning that those shots did not kill Rhodes.
¶26 There was evidence that bullets were fired into the dining room of the Franklin residence. The dining room has two windows that look out onto the gangway between Franklin's residence and the neighboring home to the south. Detective Goldberg found four bullet holes in a window of the dining room. Three of those bullet holes were caused by bullets shot from outside the residence. Detective Goldberg found two bullet holes in the wall of the Franklin dining room facing the windows through which the shots were fired into the Franklin residence. No bullet casings were recovered in the gangway. Detective Goldberg testified that the absence of casings was consistent with a shooter using a revolver to fire shots into the residence. No revolver was recovered during the investigation.
¶27 One of the bullet holes found in the same window of the dining room was caused by a bullet shot from inside the Franklin residence. Detective Goldberg testified there was a corresponding bullet hole in the neighboring residence to the south. A .45 caliber casing was recovered inside the dining room of the Franklin residence. No .45 caliber gun was recovered during the investigation.
Firearm Examiner Mark Simonson.
¶28 Examiner Mark Simonson testified to the following. Both .380 caliber casings found at the front of the Franklin residence were fired from the same gun, and such casings are "typically" automatically ejected when a bullet is fired from a semi-automatic handgun. The .45 caliber casing found inside the Franklin residence was fired from a different gun.
¶29 In an apparent reference to the two bullets found in Whitney Rhodes' body, Simonson testified that these were .38-.357 caliber bullets, and that such bullets are "typically" fired from a revolver.[5] Simonson stated that .380 caliber bullets differ from .38 caliber bullets, meaning that the .38-.357 caliber bullets found in Rhodes's body were not connected to the .380 caliber casings found at front of the Franklin residence.
¶30 The jury found Johnson guilty of second-degree reckless homicide with a dangerous weapon as a party to the crime, and possession of a firearm as a felon.
III. Postconviction Proceedings.
¶31 Johnson filed a postconviction motion requesting a new trial on both counts in the judgment of conviction on the basis of newly discovered evidence or, alternatively, ineffective assistance of counsel. Johnson contended that newly discovered evidence, in the form of a post-trial letter written by Harrington recanting his trial testimony, exculpates him. Johnson also argued that he received ineffective assistance of trial counsel because he told counsel "about ... potential witnesses," but counsel "did not interview them prior to trial or hire an investigator." Johnson requested an evidentiary hearing on both his claims. In a written decision, the circuit court denied the motion for a new trial and Johnson's related request for an evidentiary hearing.
¶32 Johnson appeals.
¶33 We will discuss other pertinent facts in the discussion that follows.
DISCUSSION
¶34 Johnson argues that he is entitled to an evidentiary hearing on both his newly discovered evidence claim and his ineffective assistance of trial counsel claim. We conclude that Johnson is not entitled to an evidentiary hearing on his newly discovered evidence claim because Harrington's statement is not supported by newly discovered corroborating evidence. Additionally, we conclude that Johnson is not entitled to an evidentiary hearing on his ineffective assistance of counsel claim because he has not alleged sufficient facts that, if true, would entitle him to relief.
¶35 We discuss, first, Johnson's argument that he is entitled to a new trial based on Harrington's recantation of his trial testimony.
I. Newly Discovered Evidence.
¶36 In June 2017, Harrington wrote a letter that states in pertinent part:
.... I lied and took a deal to testify on [Johnson] because I didn't want to get a lot of time. But now seeing what I've done, and all the time I have got him, has done nothing but haunt me and cause me deep deep pain, regret and sorrow. But after hearing about all the time he has gotten I'm ready to confess that [B]obby Johnson had no knowledge of what I had done, he actually had nothing to do with it. I looked threw [sic] the window of the gangway and saw a guy standing there with a gun, and he saw me looking threw [sic] the window of the gangway and started to shoot at me so I returned fire back at him. Furthermore I had no [knowledge] that I had hit anyone until the next day when I got arrested and got scared and lied on Bobby Johnson. After the police, D.A. and my lawyer kept giving me the idea that if I place him as the shooter I wouldn't get a lot of time. So I'm taking full responsibility for my actions, and I feel my brother Bobby [J]ohnson should not be incarcerated or in any trouble for something he didn't do or have any knowledge of[.] [It is] only because I lied [that] he has gotten all the time he has. But Bobby Johnson had no idea of what transpired in the gangway of that house. He was somewhere in the front with no knowledge of me being in the gangway ... I told the police and the D.A. that [Johnson] had a revolver[.] I lied when in fact I actually had the revolver, I'm not even for sure if he had a gun at all because I was focused on the gun Brian Robinson had[.]
A. Standard of Review.
¶37 To be entitled to an evidentiary hearing on a motion for a new trial based on newly discovered evidence, the defendant must "allege[ ] sufficient facts that, if true, would entitle the defendant to relief." State v. McAlister , 2018 WI 34, ¶25, 380 Wis. 2d 684, 911 N.W.2d 77 (quoting State v. Allen , 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433 ). Whether a postconviction motion alleges sufficient facts presents a question of law that we review de novo. Id.
B. Newly Discovered Evidence, Recantations, and Corroboration.
1. Authorities.
¶38 To obtain an evidentiary hearing on a motion for a new trial on the basis of newly discovered evidence, the defendant first "must show specific facts that are sufficient by clear and convincing proof" to demonstrate that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." Id. , ¶31. The State concedes that Harrington's statement satisfies the four initial criteria for newly discovered evidence.[6]
¶39 Where a claim of newly discovered evidence is based on a recantation, the defendant faces an additional requirement. Because "[r]ecantations are inherently unreliable," the defendant must corroborate the recantation with additional newly discovered evidence. Id. , ¶33 (alteration in original) (quoting State v. McCallum , 208 Wis. 2d 463, 476, 561 N.W.2d 707 (1997) ). To corroborate the recantation, the defendant must present newly discovered evidence that: "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation." Id. (quoting McCallum , 208 Wis. 2d at 478 ).
¶40 For the following reasons, we conclude that Johnson has failed to provide newly discovered evidence corroborating Harrington's statement.
2. Analysis.
¶41 Initially, we observe that Johnson's only engagement with the corroboration requirement is his argument tied to State v. Kivioja , 225 Wis. 2d 271, 295, 592 N.W.2d 220 (1999). Johnson's reliance on Kivioja is misplaced. In Kivioja , the Wisconsin Supreme Court considered "the manner in which a circuit court should evaluate recantation testimony when it is offered as new evidence in support of a defendant's plea withdrawal prior to sentencing. " Id. at 274 (emphasis added). The court noted that, unlike the witness in McCallum , the recanting witness in Kivioja had not testified, and by recanting the witness had not committed perjury. Id. at 293. Under those circumstances, the court adopted a modified version of the McCallum test under which defendants are "held to the lesser showing that the recantation has reasonable indicia of reliability - that is, that the recantation is worthy of belief." Id. at 295. The relaxed Kivioja standard is inapplicable in these circumstances. Instead, Johnson must satisfy the "much more difficult burden a defendant faces in a post-sentencing plea withdrawal." See id. at 293.
¶42 As explained above, that burden requires that Johnson corroborate Harrington's recantation with other newly discovered evidence that: " '(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation.' " McAlister , 380 Wis. 2d 684, ¶33 (quoting McCallum , 208 Wis. 2d at 478 ). Johnson's motion has failed to present a newly discovered feasible motive for Harrington's trial testimony. In fact, even after the circuit court concluded there was insufficient corroboration for the recantation, and the State argued in this court that Johnson has not presented such a motive, Johnson ignores this requirement in briefing in this court. Therefore, we conclude that Johnson has conceded the point. See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp. , 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (stating that a failure to refute an argument constitutes a concession).
¶43 Moreover, even if Johnson had attempted to draw such a motive out of Harrington's June 2017 letter, we would reject that argument. Harrington's June 2017 letter offers a possible motive for his alleged false testimony at trial: that Harrington was pressured by police, the district attorney, and his previous lawyer to place Johnson as the shooter, and that he did so to obtain a more favorable plea agreement. However, "this motive was fully explored at trial and is not newly discovered." See McAlister , 380 Wis. 2d 684, ¶59. Harrington testified at trial that he felt pressured by outside sources to testify against Johnson and accept a plea agreement. Harrington further testified at trial that he retained new counsel, who negotiated a plea agreement pursuant to which he would plead guilty to second-degree reckless homicide in exchange for his truthful testimony. As a result, the jury knew that Harrington had this potential motive to testify falsely. Because this motive is not newly discovered, it can not serve to corroborate Harrington's recantation. That lack of corroboration is fatal to Johnson's newly discovered evidence claim.
¶44 In sum, we affirm the circuit court's denial of Johnson's newly discovered evidence claim without an evidentiary hearing.
¶45 We now consider whether Johnson is entitled to an evidentiary hearing on his ineffective assistance of counsel claim.
II. Ineffective Assistance of Counsel.
¶46 Johnson claims that his trial counsel was ineffective for failing to investigate, and call as witnesses at trial, four persons who Johnson claims would have provided exculpatory evidence. The circuit court denied Johnson's ineffective assistance of counsel claim without an evidentiary hearing.
A. Ineffective Assistance of Counsel and Standard of Review.
¶47 The Sixth and Fourteenth Amendments to the United States Constitution guarantee to a criminal defendant the right to effective assistance of counsel. State v. Balliette , 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334. To establish ineffective assistance, a defendant must demonstrate: (1) that counsel's performance was deficient; and (2) that the deficient performance was prejudicial. Strickland v. Washington , 466 U.S. 668, 687 (1984). To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
¶48 To obtain an evidentiary hearing on a motion for a new trial based on ineffective assistance of counsel, the defendant must allege sufficient facts that, if true, would entitle him or her to relief. Balliette , 336 Wis. 2d 358, ¶18. The postconviction motion "must contain an historical basis setting forth material facts that allows the reviewing court to meaningfully assess the defendant's claims." State v. Love , 2005 WI 116, ¶27, 284 Wis. 2d 111, 700 N.W.2d 62. "[A] postconviction motion will be sufficient if it alleges ... 'the five 'w's' and one 'h'; that is, who, what, where, when, why, and how.' " Id. (quoting Allen , 274 Wis. 2d 568, ¶23 ). Whether Johnson's postconviction motion alleges sufficient material facts that, if true, would entitle him to an evidentiary hearing is a question of law that we review de novo. Allen , 274 Wis. 2d 568, ¶9.
B. Witness Statements.
¶49 The postconviction motion included the following information purportedly gathered by an investigator after Johnson's conviction.[7] The investigator spoke with four persons, three of whom said they were at the scene of the shooting: Daniel White, Alexandria Stokes, Tateanna Beasley, and Bridgette Beasley.
¶50 White told the investigator that, on the evening of the shooting, Harrington "had a revolver" and, as phrased in Johnson's motion, Harrington "brageed [sic] that he fire [sic] four or five shots into the side window of the house."
¶51 Alexandria Stokes told the investigator that she was at the party and did not see Johnson with a weapon. Stokes saw Harrington running around the side of the house and heard shots from "there" but did not know who fired the shots. Stokes heard Harrington bragging that he had fired five or six shots "into the house."
¶52 Tateanna told the investigator that she was at the party and she saw Johnson but he did not have a weapon. Tateanna heard shots from the front of the residence but did not see who fired the shots.
¶53 Bridgette told the investigator that "[s]he did not see Johnson with any weapons." Bridgette also said that she witnessed a confrontation "at the front door" between Johnson, Harrington, and Franklin's nephew, Robinson, during which Robinson fired a single shot and "went inside." After that shot, Harrington ran down the south side of Franklin's house. Bridgette also told the investigator that she, Tateanna, Johnson, and a person identified only as "Toni" "got into a vehicle driven by Stokes and left."
¶54 The postconviction motion also stated that "Johnson will testify that he told [trial counsel] about these potential witnesses but that [trial counsel] did not interview them prior to trial or hire an investigator."[8]
C. The Parties' Positions.
¶55 Johnson contends that the failure to investigate these witnesses, and call those persons as witnesses at trial, was prejudicial because they would have provided testimony to exculpate him. The State argues that Johnson's motion lacked sufficient facts to demonstrate either deficient performance or prejudice. The State further contends that the record conclusively demonstrates that Johnson is not entitled to relief.
D. Johnson Has Not Alleged Sufficient Supporting Facts.
¶56 Our discussion will focus on the prejudice prong of Johnson's ineffective assistance of counsel claim because we assume, without deciding, that Johnson's trial counsel's performance was deficient. "If the defendant fails to satisfy either prong, we need not consider the other." State v. Wayerski , 2019 WI 11, ¶32, 385 Wis. 2d 344, 922 N.W.2d 468.
¶57 For the following reasons, we agree with the circuit court's conclusion that Johnson's motion has not provided sufficient supporting facts to demonstrate that there is a reasonable probability that a different result would have occurred at trial if White, Stokes, Tateanna and Bridgette had testified at trial consistent with the information purportedly given to the investigator. Therefore, Johnson is not entitled to an evidentiary hearing on his ineffective assistance claim because his motion does not support the conclusion that he could show he was prejudiced by any ineffective assistance of counsel if he was afforded an evidentiary hearing.
¶58 We now consider those new witness statements through the lens of the subject matters mentioned in Johnson's arguments.
1. Did Johnson Possess a Gun?
¶59 Johnson contends that statements of Stokes, Tateanna, and Bridgette "varied the narrative" that Johnson possessed a gun outside the Franklin residence because each was at the Franklin residence near the time of Whitney Rhodes' death and saw Johnson, but none saw him with a weapon. According to Johnson, he was prejudiced by his trial counsel's failure to call those witnesses. We reject Johnson's assertions.
¶60 Johnson provides nothing more than conclusory statements from Stokes, Tateanna, and Bridgette that they did not see Johnson in possession of a gun. There is insufficient information to meaningfully assess their statements because the statements do not indicate the proximity of the purported witnesses to Johnson at pertinent times or the duration of their interactions with Johnson at pertinent times. If all that was presented at a hearing was the information in the motion, there would be no basis on which to assess whether the witnesses would have seen Johnson with a gun, even if he displayed a gun at some point.
¶61 We conclude that Johnson has proffered insufficient facts to support his request for an evidentiary hearing based on the statements of Stokes, Tateanna, and Bridgette that Johnson did not possess a gun outside the Franklin residence.
2. Who Was in the Gangway When the Shots Were Fired Into the Franklin House?
¶62 Next, Johnson argues that the statements of Stokes, Tateanna, and Bridgette "establish a clear alternative view" that Harrington was in the gangway, but Johnson was not, when the fatal shots were fired, and he was prejudiced because his trial attorney did not call those persons as witnesses at trial. We disagree.
¶63 Stokes' statement includes the allegation that she saw Harrington running "around the side of the house." However, Stokes does not state on which side of the Franklin residence Harrington was running. Therefore, Stokes does not place Harrington in the gangway between the Franklin residence and the residence to the south from which the fatal shots were fired.
¶64 Stokes then states that she heard shots from "there" (assumedly, the unknown side of the house where Harrington was running). Stokes further states that she does not know who fired those shots. Importantly, Stokes never relates the timing of those shots to Harrington running around a side of the Franklin house. So, there is nothing in Stokes' statements that would tie, in a temporal sense, Harrington's presence on a given side of Franklin's house to when the shots were fired as heard by Stokes.
¶65 Tateanna's statement has even less to support Johnson's motion. Tateanna states only that she heard shots "from the front of the residence, but did not see who fired those." That statement does not tie Harrington to the shots and, more importantly, does not tie those shots to the fatal shots that went through the window on the south side of the Franklin residence.
¶66 Bridgette states that she saw Harrington run down the south side of the Franklin house.[9] Bridgette does not allege that she heard shots at the time she saw Harrington on the south side of the Franklin residence. Accordingly, Bridgette's statement does not tie Harrington to the shots fired into the Franklin home through the south side window.
¶67 We conclude that the statements of Stokes, Tateanna, and Bridgette provide scant support for Johnson's contention that Harrington fired shots into the Franklin residence from the south side of the house. Accordingly, Johnson was not prejudiced by a failure to call those persons at trial.
3. Aiding and Abetting.
¶68 Finally, Johnson argues that statements of White and Stokes create doubt about whether Johnson and Harrington were "acting in concert." Apparently Johnson's allusion to "acting in concert" is a reference to the fact that Johnson was convicted as a party to the crime of second-degree reckless homicide with a dangerous weapon. Johnson does not discuss this contention other than to make that conclusory remark. We reject Johnson's argument as undeveloped. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (appellate court may decline to review undeveloped arguments); M.C.I., Inc. v. Elbin , 146 Wis. 2d 239, 244, 430 N.W.2d 366 (Ct. App. 1988) (same).
¶69 Moreover, even if Johnson had attempted to develop that argument, he has not alleged sufficient facts to show he was prejudiced because White and Stokes did not testify at trial. Taken together, White and Stokes told the investigator that Harrington said that he had fired between four and six shots "into the house" or "into the side window of the house." We conclude that, even if Harrington fired the fatal shots into the south window of the Franklin residence from the gangway, there was sufficient evidence for a jury to convict Johnson of second-degree reckless homicide as party to the crime.
¶70 We consider first Wisconsin law regarding aiding and abetting the commission of a crime.
A person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, he or she knowingly either:
assists the person who commits the crime; or
is ready and willing to assist and the person who commits the crime knows of the willingness to assist.
WIS JI- CRIMINAL 400. With that standard in mind, we now consider the trial evidence.
¶71 The evidence at trial supports the following view of the relevant events. Bridgette (the mother of Johnson's child) was in an altercation at the Franklin residence. Johnson responded by bringing a gun and leading a group of persons, including his brother Harrington, around that residence while encouraging persons to fight him. Johnson's actions show he was looking for a confrontation with persons at the Franklin residence. With one exception (Jassmine Mulbah), the witnesses who testified that they saw anyone with a gun stated that the only persons seen with guns at the Franklin residence that day were Johnson and Harrington. Further, Johnson displayed his gun and was involved in other dangerous conduct, including Harrington's firing of a gun while at the front of the residence. In addition, a gun was fired from the gangway into a window of the dining room of the Franklin residence.
¶72 We conclude that, with or without the testimony of White and Stokes regarding the purported statements made by Harrington, the jury had strong evidence to convict Johnson of second-degree reckless homicide with a dangerous weapon as a party to the crime. Our review of the full trial transcript reveals that there was overwhelming evidence that Johnson either fired the shots through the south window of the Franklin residence or that he assisted, or was ready, willing and able to assist, someone else in his group with firing the shots. For that reason, even if we assume that White and Stokes would have testified consistently with the assertions in Johnson's motion, we are confident such testimony would not have affected the outcome.
¶73 In sum, Johnson's postconviction motion based on ineffective assistance of counsel lacks sufficient supporting facts. The postconviction motion fails to draw any meaningful connections between the witnesses' new statements and the Strickland prong of prejudice. Therefore, we affirm the circuit court's denial of the motion without an evidentiary hearing.
CONCLUSION
¶74 For the foregoing reasons, the judgment of conviction and the order of the circuit court are affirmed.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2017-18).

Judge M. Joseph Donald presided over the trial, and Judge Jeffrey A. Wagner entered the order denying the postconviction motion.

For clarity, we refer to Franklin's daughters by their first names throughout this opinion.

In the record the spelling of Beasley's first name varies between "Bridgette" and "Bridget." We follow the postconviction motion and use "Bridgette." We will refer to Bridgette by her first name because we will refer to her sister, Tateanna, later in this opinion.

In the trial transcript, Harrington is often referred to by his nickname, "Long Time." We refer to Harrington by his actual name throughout this opinion.

Examiner Simonson could not determine that both bullets found in Rhodes's body were fired from the same gun because one bullet was too badly damaged, but he testified that the bullets had the same characteristics and both were a .38-.357 caliber.

Following this concession, the State nevertheless attempts to argue that the evidence is cumulative because Harrington's statement merely confirms his trial testimony. Because of the State's concession, we do not consider this argument.

The postconviction motion did not include the investigator's report as an attachment. In his briefing in this court, Johnson does not include any citations to the record in the section concerning the postconviction investigation. Furthermore, the written statements from Tateanna Beasley and Bridgette Beasley referred to in the motion do not appear anywhere in the record. Accordingly, we are left to rely on the representations in the postconviction motion regarding the statements of White, Stokes, and Bridgette and Tateanna Beasley.

On the question of whether Johnson has sufficiently alleged deficient performance, the State seizes on language in Johnson's brief on appeal to argue that "Johnson does not assert that his attorney did not talk to the witnesses; rather, he says that it would have been deficient performance if counsel did not talk to them." To the contrary, and as noted, the postconviction motion plainly states that "Johnson will testify that he told [trial counsel] about these potential witnesses but that [trial counsel] did not interview them prior to trial or hire an investigator." For that reason, we reject the State's argument.

Bridgette's statement also contains a version that does not elsewhere appear in the record. More specifically, Bridgette alleges that Franklin's nephew, Robinson, fired a shot in front of the residence and then went inside the Franklin house. After that shot, Harrington was, according to Bridgette, seen running down the south side of Franklin's house. Because Johnson does not rely on Bridgette's contention that Robinson came out of the front of the house and fired a single shot, we will not discuss further that portion of Bridgette's statement.