# COURT OF APPEALS
## DECISION
## DATED AND FILED

## July 21, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2019AP36**
**2019AP37**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 1991CF911917A
1991CF913878

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

CRAIG FELIX LATHON,

   DEFENDANT-APPELLANT.

APPEALS from an order of the circuit court for Milwaukee County: DAVID L. BOROWSKI, Judge. *Affirmed.*

Before Brash, P.J., Blanchard and Dugan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Craig Lathon was convicted of three counts of first-degree intentional homicide based on jury verdicts in 1992.  He appeals an order denying his WIS. STAT. § 974.06 (2017-18) postconviction motion for a new trial.[1]  The postconviction motion is based on purported newly discovered evidence which he contends shows that he was convicted based on the perjured trial testimony of three witnesses who conspired to frame him.  He further argues that based on purported newly discovered evidence, the State failed to disclose exculpatory evidence to the defense before trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  He also argues that the trial court erred in not granting an evidentiary hearing on his motion.  We reject Lathon's arguments related to the alleged conspiracy to frame him based on controlling propositions in *State v. McAlister*, 2018 WI 34, 380 Wis. 2d 684, 911 N.W.2d 77.  We reject his *Brady*-based argument because, even assuming such a failure to disclose, we conclude that he fails to show that he has evidence of the materiality required to sustain a *Brady* claim.  Accordingly, we affirm.

## BACKGROUND

¶2    In 1991, the State filed two criminal complaints against Lathon, which were consolidated into one case and tried together.  The complaints charged Lathon with the intentional, fatal shootings of three men on three occasions at three different Milwaukee locations:  Michael White on April 19, 1991; Craig Burnett on May 13, 1991; and O.C. Brown on May 28, 1991.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶3     We now summarize evidence as to each homicide that was presented at the jury trial before the Honorable John J. DiMotto.  This includes testimony by the three witnesses called by the State at trial who Lathon contends conspired to frame him:  Johnnie Winston, Mose Cullins, and Steven Younker.

*Michael White*

¶4     Randall Burczyk and John Zrinsky both testified that the following occurred on the night of April 19, 1991.  Burczyk and Zrinsky were watching TV with White in White's basement residence when an African American male came to the door, and called out for "Mike."  White met the male at the door.  Burczyk and Zrinsky both identified Lathon in court as the male who appeared at the door.[2]  Lathon and White engaged in a struggle, Lathon told White to lie down, and White swore at Lathon.  Lathon fired a gun at White.

¶5     A detective testified that Burczyk gave a similar account on the night of White's shooting.  The detective testified that Burczyk told him that Burczyk "got a short look at the black male" who shot White and described him as "20 to 21 years of age, about five foot six to seven, dark complected and wearing dark clothes," but also told the detective that Burczyk "didn't get a good look at his face, and that he would not be able to identify" the shooter.

---

    [2] Both Burczyk and Zrinsky failed to identify Lathon as White's shooter in a line-up held on October 21, 1991.  Both men testified that it was only after they saw Lathon's image on television that they realized that he was the shooter.  However, Burczyk also testified at trial that the men in the line-up all wore "baseball caps … pulled down pretty far over their eyes," while the man who shot White was wearing a hat that "was tilted kind of back towards the side."

¶6      Steven Younker testified to the following.[3]  On the night of April 19, 1991, Younker was with Lathon and Mose Cullins, both of whom he was already acquainted with.  Lathon and Cullins talked about buying marijuana.  The three men drove in one vehicle to the area of White's residence on or near 54th Street.  Lathon and Cullins got out of the vehicle, for the purpose (as far as Younker knew) of buying marijuana.  But shortly thereafter, Lathon and Cullins came back to the vehicle "in a rush."  Lathon drove away "real fast," and ignored a stop sign at high speed, before stopping the vehicle and getting out.  After Lathon left, a "shaky" Cullins, who appeared to be in shock, told Younker that Younker should not tell anyone, but Lathon had "just shot this white boy" in the left area of his chest.

¶7      A police detective testified that Younker gave essentially the same account to the detective during an interview in September 1991.

¶8      Mose Cullins testified to the following.[4]  On the night of April 19, 1991, he went with Younker and Lathon (with whom he had been friends since the age of nine) to a house on 53rd and Hampton because a man owed Lathon money.  Lathon asked Cullins to come with him and for Younker to stay in the car, which is what happened.  The door was open at the residence and Lathon entered, in

_____

[3] The jury learned that Younker had five prior convictions, that at the time of Lathon's trial Younker faced a maximum of 20 years' confinement on an armed robbery conviction, and that the prosecutor in Lathon's case had told Younker that he would inform Younker's sentencing judge of his cooperation in testifying at Lathon's trial.

[4] The jury learned that, as of the time of Lathon's trial, Cullins had reached the following agreements with the prosecutor:  Cullins would be charged in the Brown homicide and the State would recommend a sentence of fourteen years, and Cullins could yet be charged in the White homicide.

order to collect on a debt as far as Cullins was aware. Looking down from just outside the residence, Cullins saw Lathon walk down stairs to where several people were on a couch watching TV. Lathon pulled "a nine[-]millimeter [gun] out of his waistband and point[ed] it towards" the people watching TV. A white man tried to get the gun from Lathon, but Lathon shot the man. Lathon and Cullins then ran back to the car where Younker was waiting. Lathon drove away "real reckless and fast." After Lathon got out of the car, Cullins told Younker that he had seen Lathon shoot a man in the chest.

¶9     Cullins further testified that the next day, Lathon "bragg[ed]" to Cullins "that he had some more homicides under his belt[,] meaning that he [had] killed more people."

¶10    Johnnie Winston testified to the following.[5] At one point on the same night that White was fatally shot, Winston was with Lathon and Cullins. Lathon told Winston to "watch the news," because Lathon had shot in the chest a man who lived on 54th Street, using a nine-millimeter gun, when the man resisted a robbery by Lathon. At that point, Winston had seen Lathon carry a nine-millimeter gun on a daily basis. Lathon told Winston that he had believed that the man he shot was keeping $10,000 in his residence, but that Lathon did not take any money from the man.

---

[5] The jury at Lathon's trial learned that Winston had four convictions. Winston testified that he had reached no agreements with the prosecution, although he was serving time for escape and had "a pistol case" pending. As referenced below, Lathon's postconviction counsel now avers that Winston would now contradict his trial testimony that Lathon made incriminating admissions.

*Craig Burnett*

¶11    Jeannette Ollie testified to the following.  At approximately 2:30 a.m. on May 13, 1991, Ollie and Burnett, who were engaged, pulled into the garage of their residence on 33rd Street.  Two men displaying guns confronted them from either side of the car and announced "a BOS robbery," which Ollie understood to mean a robbery by gang members.  At gunpoint, the men forced Ollie and Burnett into their residence.  One robber stayed with Ollie in the living room and the other, whom Ollie identified as Lathon, went with Burnett into a bedroom.  Ollie heard a gunshot, Lathon and the other man ran out of the residence.  Ollie found Burnett in the bedroom, having been shot in the head by Lathon.[6]

¶12    Ollie testified as follows about what she said was one of several pieces of jewelry that the robbers took from Burnett.  Burnett and Ollie had both had similar necklaces featuring the shape of an anchor.  The prosecutor asked the jury to compare Ollie's anchor necklace with an anchor necklace that Lathon was photographed wearing, on the theory that Lathon was wearing Burnett's companion anchor necklace that had been taken in the robbery.  Ollie testified that Lathon's necklace in the photograph appeared to be the one taken from Burnett in the robbery, although on cross examination she qualified this to say that it was at least similar to the one Burnett had.

---

[6] Ollie acknowledged in her trial testimony that during the police investigation she had been unable to identify Lathon in a police line-up.  However, she testified that, when he was in the line-up, Lathon was wearing a cap that covered so much of his face that it did not "really reveal his features," and that "there is no doubt in my mind that" the photo of Lathon showed the man who shot Burnett, whom she testified she had a chance to observe on the night of the shooting.

¶13     Winston testified to the following. Lathon swore to Winston in mid-May 1991 that he had shot a man named Burnett in the head. Lathon said that this occurred after Lathon "told [Burnett] to give him the money" and Burnett had reached for a gun. At around this same time, Winston saw Lathon wearing a necklace with an anchor and Lathon explained that he had gotten it from Burnett.

¶14     Cullins testified that, on a date that is unclear from the transcript, Lathon told Cullins that Lathon had shot a man in the head on 33rd Street, under circumstances that generally align with aspects of the shooting of Craig Burnett as summarized above.

*O.C. Brown*

¶15     Brian Brown testified to the following. On May 28, 1991, he was at the residence of his father, O.C. Brown, and in the presence of his father, when Cullins pulled a car into the driveway. Cullins got out of the car, pointed a gun at the two Browns, and made a threat. O.C. Brown engaged in a physical struggle with Cullins. Cullins called out for a man who was standing in the driveway to shoot O.C. Brown. The man standing in the driveway shot O.C. Brown in the back.

¶16     Isaac Briscoe testified to the following. On May 28, 1991, Briscoe was in a car with Lathon and Cullins. Cullins stopped the car in a driveway and started arguing with a man (Brian Brown) at the residence adjoining the driveway. Cullins pulled out a gun and O.C. Brown started struggling with Cullins. Lathon got out of the car with a nine-millimeter gun and moved toward Cullins and O.C. Brown when there was a gunshot. Briscoe heard the gunshot after Lathon got out

7

of the car and started to walk toward the struggling Cullins and O.C. Brown.[7] Lathon, Briscoe, and Cullins then sped from the scene of the shooting.

*Trial Results And Direct Appeal*

¶17    The jury convicted Lathon on all three counts of first-degree intentional homicide and he was sentenced to consecutive terms of life imprisonment.

¶18    In November 1993, this court rejected issues that Lathon raised on direct appeal and affirmed the judgment of conviction and an order denying his request for postconviction relief.

*Current WIS. STAT. § 974.06 Motion*

¶19    In a WIS. STAT. § 974.06 motion filed in June 2017, Lathon requested an evidentiary hearing based on the claim that newly discovered evidence establishes that he was framed by Younker, Cullins, and Winston in the shooting deaths of White and Burnett.  Lathon supported this request with affidavits we now summarize:[8]

- A 2003 affidavit of Corey Martin averred in part the following. When Martin was an inmate in the House of Corrections "[b]ack in

---

[7] Defense counsel conceded in closing argument that Lathon fatally shot O.C. Brown, but took the position that the jury should find that it was an accidental shooting.  This was based on testimony from a detective that, in a May 1991 interview, Lathon said that while Cullins and "the old man" (O.C. Brown) were fighting, Lathon's gun was cocked and his gun went off when the "dude" (Brian Brown) bumped Lathon's arm.

[8] We omit from this summary, and from further discussion in this opinion, reference to Charles Hart, a potential witness mentioned in the postconviction motion.  It is sufficient to explain this omission that neither Lathon's principal brief nor his reply brief contain a single substantive reference to Hart.

1991/1992," Cullins, Winston, and [Younker] were also inmates. Martin was present when the three men agreed to "lie on" Lathon at his trial, and maintain "the story," to help Cullins avoid a life sentence.

- A 2008 affidavit of Calvin Robinson averred in part the following. When Robinson was an inmate in the Milwaukee County Jail "between 1991-1992," Cullins and Winston were also inmates. Cullins and Winston asked Robinson to falsely tell police that Lathon had admitted to Robinson while in jail that Lathon had committed the White and Burnett homicides. "Cullins & somebody else" had actually committed the White and Burnett homicides, and they wanted to frame Lathon for both of those homicides, since Lathon was already admitting that he had shot Brown. But Robinson had "second thought[]s" about falsely accusing Lathon, and ended up telling the prosecutor in Lathon's case that Cullins and Winston were trying "to place the 2 homicide charges on Craig Lathon, so they could avoid going to prison." But the prosecutor never took Robinson up on his offer to testify at Lathon's trial that Cullins and Winston were trying to frame Lathon.

- A newly created affidavit of postconviction counsel averred in part the following. At some unidentified time, counsel had spoken with Tronnie Dismuke, who would testify to the following. Around 1991, Dismuke was an inmate in the House of Corrections, along with Younker and Winston. Younker told Dismuke that Cullins and Winston "got [Younker] involved in putting a case on Craig Lathon." After Dismuke was released on bail, Winston told Dismuke that "[t]hey were putting the crimes on Craig Lathon because he was not 'one of us' and because the district attorney said that someone has to go down for it and they decided it may as well be Lathon, as long as it was not one of them."

Counsel further averred that in February 2015, Winston made statements to counsel that included the following. Lathon never told Winston that he had killed anyone and never told Winston "that he had taken a piece of jewelry off of a dead guy," meaning Burnett. "Winston would have known if Lathon had killed anyone because [Winston and Lathon] were always together."

Counsel further averred that at unidentified times he had spoken with Lathon's mother who told him that the anchor necklace that the State alleged Lathon was wearing after taking it from the dead or dying Burnett was in fact a necklace that Lathon owned before Burnett was killed.

9

¶20    Lathon argued that these affidavits warrant an evidentiary hearing because "newly discovered witnesses Corey Martin, Calvin Robinson, and Tronnie Dismuke," as well as the alleged Winston recantation, "confirm the fact that Mose Cullins, Johnny Winston, and Steve Younker … admitted that Lathon in fact was not involved in" the White and Burnett homicides.  Lathon further argued that the Robinson affidavit explains how the prosecutor "failed to disclose" the fact that Robinson had revealed to the prosecutor a plan to frame an innocent man.

¶21    The State argued in response, in part, that Lathon's postconviction motion offered "evidence that only serves to impeach" witnesses and also lacked independent corroboration.  As to the alleged **Brady** violation, the State argued in part that "the evidence was not material, i.e., the defendant was not prejudiced," even assuming the truth of the allegations and that the prosecution had not made a disclosure.

¶22    In a written decision, the Honorable David L. Borowski denied the motion for a new trial without holding an evidentiary hearing.  Lathon appeals. We explain below why we agree with each of the conclusions reached by the circuit court, using reasoning on both issues that is similar to that expressed by the circuit court in its decision.

## DISCUSSION

¶23    Whether a postconviction motion alleges sufficient facts to entitle the defendant to a hearing for the relief requested is subject to a mixed standard of review.  *State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.  We begin by determining whether the motion alleges sufficient facts that, if true, would entitle the defendant to relief.  *Id.*  This is a question of law that we review

de novo. ***State v. Bentley***, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). If the motion raises such facts, the circuit court must hold an evidentiary hearing. ***Id.*** However, if the motion does not raise facts sufficient to entitle the defendant to relief, "or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." ***Allen***, 274 Wis. 2d 568, ¶9. We review the "court's discretionary decisions under the deferential erroneous exercise of discretion standard." ***Id.*** In a WIS. STAT. § 974.06 motion, "the burden shifts to the defendant who must show the need for a postconviction evidentiary hearing with a clearly articulated justification." ***McAlister***, 380 Wis. 2d 684, ¶28 (citing ***State v. Balliette***, 2011 WI 79, ¶58, 336 Wis. 2d 358, 805 N.W.2d 334).

¶24    Both claims for relief here are based on purported newly discovered evidence. Our supreme court summarized the applicable standards in ***McAlister***:

> If a judgment is to be set aside based on newly discovered evidence, the defendant must provide sufficient evidence to establish that defendant's conviction is a manifest injustice. To obtain an evidentiary hearing for such an allegation, a defendant must show specific facts that are sufficient by clear and convincing proof, when considered in the context of the record as a whole, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.
>
> If a defendant satisfies those four criteria, then "the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt."

*Id.*, ¶¶31-32 (citations omitted). The court in *McAlister* further explained that the following test applies to recantation evidence, and that it also can be "a useful framework" to use when considering the allegation of a third party that a witness admitted committing perjury:

> A claim of newly discovered evidence that is based on recantation also requires corroboration of the recantation with additional newly discovered evidence. As we have explained, "[r]ecantations are inherently unreliable." Therefore, corroboration requires newly discovered evidence that "(1) there is a feasible motive for the initial false statement; and, (2) there are circumstantial guarantees of the trustworthiness of the recantation."

*Id.*, ¶33 (footnote omitted, but content of footnote referenced) (citations omitted); *see also id.*, ¶56 (holding that the corroboration requirement applied to three affidavits averring that two trial witnesses admitted to lying in giving inculpatory testimony at trial).

## I.     ALLEGED CONSPIRACY TO FRAME LATHON

¶25    Lathon argues that he is entitled to an evidentiary hearing because, if the averments in the affidavits of Martin, Robinson, and trial counsel (quoting Dismuke and Winston) are credited, this would provide jurors at a new trial with a reasonable basis to find that Lathon did not commit the White and Burnett homicides "and that Winston, Younker, and Cullins had conspired for their own purposes to conform their testimony and enlist others to falsely accuse Lathon."[9]

---

[9] Lathon's argument regarding the need for a new trial in the Brown homicide is largely that Lathon's accidental shooting theory would be easier for a jury to accept if jurors did not think that he had fatally shot White and Burnett. However, as the State points out, the court specifically instructed the jury not to allow its verdict on one charge to influence its verdicts on the other charges and we presume the jurors follow instructions. Further, we reject Lathon's arguments regarding the White and Burnett homicides and, therefore, his theory about the influence of those homicides on the Brown homicide has no starting point.

However, when the State correctly points out that our supreme court in *McAlister* rejected strikingly similar arguments based on generally similar facts by the defendant, Lathon offers only weak attempts to distinguish *McAlister*, putting aside his contention that *McAlister* was wrongly decided.[10]

¶26    We now summarize *McAlister*, then explain how it controls the first issue and why we reject Lathon's attempts to distinguish it.

---

[10] Lathon bases numerous arguments on the premise that *State v. McAlister*, 2018 WI 34, 380 Wis. 2d 684, 911 N.W.2d 77, was wrongly decided. We limit our discussion of these various arguments to this footnote.

Lathon accurately acknowledges that, because our "supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case," *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), this court is bound by *McAlister*, if we conclude, as we do, that it cannot be distinguished.

At the same time, Lathon argues that "*McAlister*'s analysis conflicts with long-standing and still-controlling (i.e., unreversed) authority" that predates *McAlister*. Lathon contends that the facts in *McAlister* represented a "perfect storm" of deficits for the defense "that led the *McAlister* [c]ourt to forgo settled law and substitute its own credibility findings for that of a jury, or even a judge at an evidentiary hearing."

Lathon also suggests that the "long-standing rule that where supreme court decisions appear to be inconsistent, or in conflict, we follow the court's most recent pronouncement," *see Kramer v. Board of Educ. of Sch. Dist. of Menomonie Area*, 2001 WI App 244, ¶20, 248 Wis. 2d 333, 635 N.W.2d 857, is not consistent with *Cook*. For these reasons, Lathon contends, we should ask our supreme court to certify this appeal and, if certification is rejected, note that *McAlister* "conflicts with controlling law." We are not persuaded that anything of value would be gained by certification. The majority of the court in *McAlister* made clear, broad statements, rejecting alternative points made by the concurring justice and the two dissenting justices. *See McAlister*, ¶¶65-73 (Kelly, J., concurring); ¶¶74-102 (A.W. Bradley and Abrahamson, JJ., dissenting). Lathon has the opportunity to petition our supreme court for review of this opinion. If the court decided to grant such a petition, it could consider his criticisms of *McAlister*.

Further, we reject as thoroughly undeveloped whatever argument Lathon intends to make by briefly referencing the notion of a novel "federal due process right to reversal on newly discovered evidence grounds."

### A. *McAlister*

¶27 McAlister was charged with multiple armed robbery-related crimes. *Id.*, ¶1. At his jury trial, the State called Jefferson and Waters to testify that McAlister "was their accomplice in the robberies," and in the course of cross examination the defense attempted to impeach both Jefferson and Waters based on favorable deals they had with the prosecution. *Id.*, ¶¶1, 10-11, 16.

¶28 In a WIS. STAT. § 974.06 motion for a new trial, McAlister alleged that he had newly discovered evidence in the form of affidavits of three men: (1) McPherson averred that, before McAlister's trial, while McPherson and Waters were incarcerated together, Waters told McPherson that he had lied to police about McAlister's involvement in the armed robberies and that he had written to Jefferson, instructing him what to tell police; (2) Prince averred that, starting before and ending after McAlister's trial, while he and Jefferson were incarcerated together, Jefferson told him that Waters had told Jefferson "exactly what to say regarding their pending charges," that McAlister "was never involved in any of the robberies they committed," and that Waters had "instructed him to lie" in order to win them shorter sentences; and (3) Shannon averred that, before McAlister's trial, he was incarcerated with Jefferson, who told Shannon that Jefferson and Waters were the only two people involved in one of the robberies that McAlister was charged with, but that Jefferson had struck a plea deal to testify against someone who had not been involved in the robbery. *Id.*, ¶¶2, 22-24.

¶29 The circuit court denied the motion for a new trial without holding an evidentiary hearing. *Id.*, ¶2. Our supreme court affirmed, concluding that the affidavits of McPherson, Prince, and Shannon "were merely cumulative evidence because they were additional evidence of the same general character as was

14

subject to proof at trial, i.e., that Jefferson and Waters lied when they implicated McAlister in order to achieve favorable plea bargains for themselves." *Id.*, ¶4. The court further determined that "the affidavits were insufficient to require the circuit court to hold a hearing on McAlister's motion for a new trial because they were supported by neither newly discovered corroborating evidence or circumstantial guarantees of trustworthiness," in part because the affidavits were created years after the events they purported to describe. *Id.*, ¶¶4, 52.

### B.     *McAlister* Controls

¶30     Under circumstances highly similar to those presented here, the court in *McAlister* held that the content of the McPherson, Prince, and Shannon affidavits was "merely cumulative" of proof at trial under the fourth prong of the general newly discovered evidence test, and also that the content of the affidavits lacked the requirement of corroboration required for newly discovered evidence that is based on a recantation. *Id.*, ¶¶31-63. The facts in the two cases, of course, do not align perfectly. We are also mindful of the court's cautions in *McAlister* that "whether to grant a hearing on a WIS. STAT. § 974.06 motion for a new trial based on newly discovered evidence that claims to uncover perjured trial testimony requires careful examination of the movant's specific factual allegations in the context of the record as a whole," and also that the "'degree and extent of the corroboration required [for newly discovered evidence based on recantation] varies from case to case based on its individual circumstances.'" *Id.*, ¶¶28, 57 (quoted source omitted). However, having made a careful examination of the allegations presented by Lathon and the individual circumstances of this case, we conclude that each of his arguments must be rejected under the reasoning in

15

*McAlister* and for this reason he has failed to meet his burden to show the need for a hearing.

¶31    We could affirm based on either the "merely cumulative" prong or the lack of corroboration alone, but like the court in *McAlister* we address both, given how directly applicable the discussion is in *McAlister*.

*Cumulative*

¶32    The court in *McAlister* stated the following as a general rule: "Where the credibility of a prosecution witness was tested at trial, evidence that again attacks the credibility of that witness is cumulative." *Id.*, ¶39.  Using this general rule as a guide, the court concluded that the newly discovered witnesses, who alleged a pretrial plan by Jefferson and Waters to "lie about McAlister" at his trial "to benefit themselves," met the definition of cumulative evidence: "additional evidence of the same general character, to some fact or point, which was subject of proof before." *Id.*, ¶39-51 (citation omitted).  It is the same here. Lathon relies on newly discovered witnesses Martin, Robinson, and Dismuke, along with the allegedly recanting Winston, to allege a pretrial plan by Winston, Cullins, and Younker to lie about Lathon at his trial to benefit themselves and each other.

¶33    Moreover, in a similar manner to what occurred in cross examinations at trial in *McAlister*, the defense at Lathon's trial probed the credibility of Winston, Cullins, and Younker, inviting the jury to question whether they were telling the truth or instead lying about Lathon to help themselves. *See id.*, ¶¶43-49.  In one illustrative example, defense counsel asked Younker, regarding his expectation of a favorable statement from the prosecutor to a

16

sentencing court who could give Younker a sentence of up to twenty years' confinement:  "And would it be safe to say, Mr. Younker, that you would do anything to get any kind of consideration?"

¶34     In attempting to distinguish *McAlister* on the merely cumulative topic, Lathon argues that the newly discovered potential testimony of Martin, Robinson, and Dismuke, and the recantation of Winston, would be admissible to show prior inconsistent statements of Winston, Cullins, and Younker.  Lathon's argument continues, "*McAlister* did not address or decide whether the cooperating witnesses' prior [in]consistent statements would have been cumulative if offered as substantive evidence of McAlister's innocence."  However, Lathon simply tries to place a new label ("substantive evidence") on a proposition directly rejected in *McAlister*, when the court stated that the substance of the newly discovered evidence offered by McAlister was "of the same general character and drawn to the same point" as the impeachment that occurred at trial.  *See id.*, ¶50.  The additional label "substantive evidence" adds nothing, under the controlling reasoning in *McAlister*.

¶35     Lathon is wrong if he intends to argue that the alleged newly discovered revelation in *McAlister* lacked an equivalent feature to the alleged newly discovered revelation here that Winston, Cullins, and Younker expressed the belief that Lathon was innocent of the White and Burnett homicides.  As the summary above shows, the court in *McAlister* operated from the premise that McPherson, Prince, and Shannon believed McAlister to be innocent.  *See id.*, ¶¶21-23.

¶36     Lathon also argues that the newly discovered evidence here would reveal that Winston, Cullins, and Younker were "coconspirators" who actively

17

worked together and discussed a scheme to commit perjury to help not only themselves individually but to help each other, giving them an "additional motive." But this "additional motive," an active conspiracy-to-perjure, was also allegedly afoot in *McAlister*. For example Prince averred that Jefferson had reported that Waters told Jefferson "exactly what to say regarding their pending charges," so that they could receive shorter sentences. *See id.*, ¶22. Lathon fails to identify anything about differences between the two cases regarding the alleged plans to commit perjury that could matter under the controlling reasoning in *McAlister*.

*Lack Of Corroboration*

¶37    The court in *McAlister* noted that the affidavits submitted in support of the motion in that case were not "classic recantation testimony" because the three affiants relayed what trial witnesses Jefferson and Waters allegedly had told them about plans to lie in trial testimony, as opposed to being sworn post-verdict admissions to perjury by Jefferson and Waters themselves. *Id.*, ¶¶52-54. Nevertheless, the court determined that the affidavits represented the functional equivalent of recantations and, therefore, had to meet the corroboration requirement that is imposed because recantations are inherently unreliable. *Id.*, ¶¶55-56. Applying the two corroboration requirements—newly discovered evidence of a feasible motive for the initial false statement and circumstantial guarantees of trustworthiness of the recantation—the court concluded that McAlister failed both. *Id.*, ¶¶57-62.

¶38    Applying the reasoning in *McAlister*, Lathon also fails both corroboration requirements, as Lathon comes close to conceding by acknowledging that the considerations that decided the corroboration issue in

18

McAlister "are present here to some degree." If the motive "to obtain plea bargains that would reduce their imprisonment time" was "fully explored at trial and is not newly discovered" in *McAlister*, *see id.*, ¶59, then it was "fully explored at trial and is not newly discovered" in this case. Lathon acknowledges that "the fact that Cullins, Winston, and Younker each had motive to falsely accuse Lathon to mitigate the consequences of his own wrongdoing."

¶39 In addition and similarly, if the lengthy passage of time between McAlister's trial and the submission of the affidavits, as well as the fact that the allegations of a framing were made in jail, rendered the affidavits in *McAlister* lacking in circumstantial guarantees of trustworthiness, *see id.*, ¶¶60-61, those same facts in this case have the same significance. Indeed, here there were extreme and unexplained delays not only between Lathon's 1992 convictions and the creation of the Martin and Robinson affidavits, but also between the creation of the affidavits and the postconviction motion. Lathon makes an outlandish comparison between the circumstances here and delayed reporting by sexual assault victims.

¶40 Notably, the court in *McAlister* stated that it did not help McAlister that the three newly discovered witnesses corroborated each other's testimony. *See id.*, ¶62. Therefore, we are not permitted to count as an independent factor in favor of corroboration that aspects of the new Martin, Robinson, Dismuke, and Winston statements support each other.

¶41 Also significant here is the categorical statement in *McAlister* that "recantations made while in jail are 'highly suspicious.'" *See id.*, ¶61 (quoted source omitted). Following *McAlister*, we must reject Lathon's argument that

19

suspicion of jailhouse recantations arises only when there is a specific, identified basis "to suspect coercion or influence."

¶42 Lathon asserts that a distinguishing feature of this case from *McAlister* is that here there was "direct evidence of the [S]tate's witnesses' conspiracy to defraud the [c]ourt and frame Lathon [in] the White and Burnett homicides." By "direct evidence," Lathon apparently is referring to Martin's averment that he was physically present when Winston, Cullins, and Younker conspired to falsely incriminate Lathon to help Cullins avoid a life sentence. But Lathon fails to develop an argument that the nature of the alleged conspiracy to frame McAlister differs in kind from the alleged conspiracy to frame Lathon, including the shared factual features on points emphasized by the *McAlister* court in addressing the corroboration requirement. Further, Lathon's postconviction allegations lack what one would normally call "direct evidence" in this context, namely, allegations by witnesses that Lathon had alibis at the time of the homicides or from someone present at the scene of a homicide to say he was not present.

¶43 Lathon apparently intends to argue that there is sufficient corroboration in the following: Lathon's postconviction counsel averred that Winston told counsel that Lathon never said to Winston that he had killed anyone, that Lathon never told Winston "that he had taken a piece of jewelry off of a dead guy," and that Winston would have known if Lathon had murdered anyone. Lathon fails to develop an argument that these statements represent circumstantial guarantees of trustworthiness that outweigh the factors emphasized in *McAlister*. Lathon makes numerous references to evidence regarding the anchor necklace that the State at trial contended Lathon had stolen from Burnett, based in part on

20

photographic evidence. It is sufficient to observe that Lathon fails to point to significant newly discovered evidence that undermines the State's theory regarding the necklace. This is a jury issue that would be resolved at a new trial based on the same basic dynamics that the jury was presented with at the 1992 trial.

¶44    Echoing his argument from the "merely cumulative" topic discussed above—to the effect that the newly discovered evidence here would reveal an active conspiracy by Winston, Cullins, and Younker—Lathon contends that it corroborates his newly discovered evidence that the evidence reveals a motive of each witness to help the other witnesses, not just to help themselves individually. Again, however, this was also a feature of the alleged conspiracy-to-perjure in *McAlister*. It does not add anything for Lathon to speak in terms of "acts of collusion" and a "fraudulent scheme." The same sort of scheme was at issue in *McAlister*.

## II.    ALLEGED *BRADY* VIOLATION

¶45    Lathon makes a brief argument that Robinson's affidavit provided a sufficient showing to entitle him to a hearing to show that the State failed to disclose exculpatory evidence material to guilt. The State argues that, even assuming that Robinson would testify credibly and consistently with his affidavit and his alleged statements to the prosecutor were suppressed, Lathon has not shown a reasonable probability that this disclosure would have produced different verdicts. We agree with the State's argument.

¶46    Our supreme court has explained that the following standard of review and substantive legal standards apply to address *Brady* claims:

21

[W]e independently review whether a due process violation has occurred, but we accept the trial court's findings of historical fact unless clearly erroneous. A defendant has a due process right to any favorable evidence "material either to guilt or to punishment" that is in the State's possession, including any evidence which may impeach one of the State's witnesses. A ***Brady*** violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material.

The materiality requirement of ***Brady*** is the same as the prejudice prong of the … analysis [under ***Strickland v. Washington***, 466 U.S. 668 (1984)]. Evidence is not material under ***Brady*** unless the nondisclosure "was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."

***State v. Wayerski***, 2019 WI 11, ¶¶35-36, 385 Wis. 2d 344, 922 N.W.2d 468 (citations omitted).

¶47     As summarized above, ewaccording to Robinson's 2008 affidavit, fellow jail inmates Cullins and Winston asked Robinson to falsely tell police that Lathon had admitted to committing the White and Burnett homicides, even though they informed Robinson that it was Cullins and an unidentified person who had actually killed White and Burnett. After Robinson started to participate in the perjury scheme and then had "second thoughts," he told the prosecutor in Lathon's case about the request to have him make false accusations, but the prosecutor did not take Robinson up on his offer to testify to the perjury scheme.

¶48     We assume purely for the sake of resolving this issue the truth of Robinson's averments. The State does not dispute that it did not disclose to the defense that Robinson had told the prosecutor about an attempt to get Robinson to commit perjury. Thus, we assume that Lathon has satisfied the first two ***Brady***

requirements: that the content of the affidavit was evidence favorable to Lathon because it would be impeaching and that this favorable evidence was suppressed by the State.

¶49 On the materiality issue, however, we are not persuaded that, assuming that Robinson were to testify credibly and consistently with his affidavit, it would have created a reasonable probability of a different result. As the State points out, Robinson did not claim to have any direct knowledge about any of the three homicides. Moreover, he purported to have learned 100 percent of what he would testify to while confined in jail and while communicating with people whom he would call perjurers. At most, it would have created additional reasons for the jury to consider the testimony of Winston and Cullins with caution and great care. But the jury already had ample reasons to do that. Further, as our extensive summary above reveals, the State presented substantial direct evidence incriminating Lathon beyond that provided by Winston and Cullins.[11]

¶50 Lathon refers to Winston, Cullins, and Younker as "the [S]tate's three main witnesses" on the White and Burnett homicides. That is, a necessary element in Lathon's argument is that the testimonies of Winston, Cullins, and Younker were "critical" to the State's case, without which the outcome would probably have been different. But this inappropriately downplays the direct identification testimony of two witnesses who testified that it was Lathon who shot

---

[11] Lathon asks us to exercise our discretionary power to reverse his conviction and order a new trial in the interest of justice under this court's inherent authority or because "it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." *See* WIS. STAT. § 752.35. However, so far as we can discern, this request does not include any argument not already addressed and rejected for the reasons stated above.

23

White (Burczyk and Zrinsky) and one witnesses who testified that Lathon shot Burnett (Ollie). It is true that the failure of Burczyk, Zrinsky, and Ollie to pick Lathon out of the line-up gave the defense a reason to question these identifications. But the witnesses also explained that their views of Lathon in the line-ups were flawed, because too much of Lathon's face was obscured by a hat. Once they were able to see Lathon without obstruction, they confidently identified him as the shooter. Moreover, stepping back, none of the newly discovered evidence offered by Lathon purports to directly undermine the testimony of Burczyk, Zrinsky, or Ollie, such as by suggesting a motive to testify falsely or an admission by one of them to contrary facts.

## CONCLUSION

¶51 For these reasons, we affirm the order denying Lathon's WIS. STAT. § 974.06 motion.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

24